810 F.2d 1250
 7 Fed.R.Serv.3d 291, 8 Employee Benefits Ca 1136,
22 Fed. R. Evid. Serv. 573
 F.H. KREAR & CO., Plaintiff-Appellee,
v.
NINETEEN NAMED TRUSTEES, as Trustees of Local 69 Pension
Fund, Local 69 Vacation Fund & Local 69 Health Benefit Fund:
John H. Leaver, Frank Esposito, Anthony Nicoletti, Al
Ehrlich, Carol Murray, Royland H. Hill, James Santos, Edward
Seaman, Steve Wilson, Victor Mayers, Gerson Kaiserman,
Joseph Yachnowitz, Richard Sylvan, Norman Shapiro, Fred H.
McKenna, Angelo Dadolato, Robert E. Dowd, Edward J. Egan,
and Bert Levethal, Defendants, Third Party Plaintiffs,
Fourth Party Plaintiffs-Appellants,
Hotel & Restaurant Employees & Bartenders International
Union Pension Fund and Hotel & Restaurant Employees &
Bartenders International Union Welfare Fund by Their
Trustees, Edward T. Hanbley, Joseph Belardi, John C.
Kennally, Herman Leavitt, Paul McCastland, Roland
Richardson, William Schuman, John Cullerton, Lewis R. Cohen,
Donald S. DePorter, Dominic Luongo, A.W. Mitchell, Ben
Schmontey, Herbert Triplett, A.M. Charles Patrick Kane,
Fredric N. Richman, Vito Pitta, Defendants, Counterclaim
Plaintiffs-Appellants,
v.
Anthony GRAUSO, Individually and d/b/a Software & Systems
Development Co., a Partnership, Third Party
Defendants Appellees,
Robert Mozer, Third Party Defendant, Fourth Party Defendant-Appellee.
 No. 1439, Docket 86-7284.
 United States Court of Appeals,
Second Circuit.
 Submitted July 15, 1986.
Decided Jan. 20, 1987.
 
 Douglas J. Kramer, New York City (Marilyn Go, Baden, Kramer, Huffman & Brodsky, P.C., New York City, Harvey M. Katz, Washington, D.C., on the briefs), for plaintiff-appellee.
 Lewis M. Steel, New York City (Richard F. Bellman, Steel & Bellman, P.C., New York City, Leon Friedman, Hempstead, N.Y., Ira Drogin, Leaf, Sternklar & Drogin, New York City, on the briefs), for defendants, third party plaintiffs, fourth party plaintiffs-appellants.
 Michael G. Berger, New York City (Miriam J. Haines, New York City, on the brief), for third party defendants-appellees.
 Robert Swetnick, New York City (Swetnick, Mozer & Weiner, New York City, of counsel), for third party defendant, fourth party defendant-appellee.
 Before OAKES, NEWMAN and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Nineteen Named Trustees ("Trustees") appeal from a final judgment entered in the United States District Court for the Southern District of New York, Shirley Wohl Kram, Judge, following a jury trial on certain issues and a bench trial on other issues. The judgment (1) awarded plaintiff F.H. Krear & Co. ("Krear") $363,183, including prejudgment interest, for the Trustees' breach of contract, (2) awarded third-party-defendant Anthony Grauso $53,104, including prejudgment interest, for the Trustees' breach of contract, and (3) awarded Krear a total of $452,820 in attorneys' fees and expenses, pursuant to a contract provision. A prior attempt by the Trustees to appeal the first two awards was dismissed for lack of appellate jurisdiction since a decision had not yet been rendered on the contract claim for attorneys' fees. See F.H. Krear & Co. v. Nineteen Named Trustees, 776 F.2d 1563 (2d Cir.1985). On this appeal, the Trustees challenge all of the above awards, contending principally that the court made a variety of errors in its trial rulings and erred in both the awarding and the calculation of attorneys' fees to Krear. For the reasons below, we affirm so much of the judgment as awarded damages, plus interest, of $363,183 to Krear and $53,104 to Grauso; we vacate the award of attorneys' fees and remand for entry of a modified judgment awarding Krear $261,518 in attorneys' fees and expenses, upon the condition set forth in Part II.C.5. below.
 
 I. BACKGROUND
 A. The Parties and the Events
 
 2
 Krear was a firm that offered administrative services to employee benefit plans. The Trustees were trustees of three benefits funds (the "Funds") maintained by Local 69 of the Hotel and Restaurant Employees and Bartenders Union ("Local 69") for the benefit of its members.
 
 
 3
 In early 1979, the Trustees, anticipating the growth of contributions to the Funds, decided that the Funds needed computerization and professional administration. They formed a committee to select a company to provide these services, and asked third- and fourth-party-defendant Robert Mozer, the Funds' attorney, to assist. They also hired Grauso, a computer consultant with whom the Funds later entered into a five-year consulting contract, to evaluate any proposals the Funds had received or would receive.
 
 
 4
 During this period a controversy developed between Local 69 and the Hotel and Restaurant Employees and Bartenders International Union ("International") concerning which of them would control the Funds. When Mozer contacted several potential computer and administrative service companies, most of them declined to submit service proposals, stating that they did not want to get involved in a struggle between Local 69 and the International. Consequently only two written proposals were received by the Funds: one from a company called Administrative Consultants, Inc., and the other from Krear. Both Mozer and Grauso recommended that the Trustees negotiate agreements with Krear.
 
 
 5
 On July 1, 1979, each of the three Funds entered into a three-year contract (collectively the "Contracts") for Krear to furnish, inter alia, "[a]ll administrative functions related to the collection of monies due the Fund ... [and] [d]evelopment of all computer software as defined by the Fund as reasonably necessary...." Each contract provided that Krear would receive a minimum monthly payment or a specified percentage of the collections it made on behalf of the Fund, whichever was greater. Although the Contracts did not specify how much time it should take to develop the computer system, Krear's proposal and Grauso's recommendation estimated an eight-to-twelve month start-up period. Each contract provided that New York law would govern, and each contained the following provision: "In the event of any litigation between the parties, the prevailing party shall have the right to reimbursement of reasonable attorney's fees in regards to such litigation from the other."
 
 
 6
 On October 1, 1979, the International prevailed in the struggle with Local 69 over control of the Funds. Local 69 was merged into another local union ("Local 6") headed by one Vito Pitta, who had the support of the International, and Local 6 began administering the Funds. In that month, the Funds ceased to pay Krear and, according to Krear, barred it from entering the Funds' offices to collect data in preparation for computerization.
 
 
 7
 Krear promptly commenced the present action against the Trustees seeking, inter alia, $1,382,500 in damages for breach of contract, contending that they had ceased payments to Krear and interrupted its performance without any valid reason but solely because of the International's political victory over Local 69. The Trustees counterclaimed, contending that Krear had failed to perform the Contracts and that the Contracts had been fraudulently procured by means of a conspiracy among Krear, Grauso, and Mozer, resulting in excessively high fees to Krear. On the counterclaims, the Trustees demanded $158,476 in compensatory damages and a total of $475,428 as punitive damages. The Trustees also sued Grauso, asserting that he had failed to perform his contractual duties, and Mozer, asserting that he had breached his fiduciary duties to the Funds. Grauso counterclaimed against the Trustees for terminating his five-year consulting contract.
 
 B. The Jury Trial
 
 8
 In 1985, a jury trial was held with respect to all issues except those relating to the Contracts' provision for the prevailing party to recover attorneys' fees. At that trial, Krear presented evidence of the above events and introduced the testimony of Mozer indicating that the International, through Local 6, had sought to avoid Local 69's prior contracts:
 
 
 9
 The policy was to try and get the local trustees to obtain releases I might say on all service providers before they merged into the international funds.
 
 
 10
 If that could not be done, the policy was to resist payment in the main. Sometimes they were paid, but in the main it was to resist.
 
 
 11
 Krear sought to prove its damages through documents and the testimony of its two corporate officers, John David Krear ("John Krear") and Saul D. Weiner. The Contracts were introduced, showing that Krear was to have been paid a minimum total of $39,784 per month or a greater amount based upon a percentage, which varied from Fund to Fund, of the contributions collected for that Fund if the contributions exceeded certain levels. John Krear described Krear's anticipated expenses, including the employment contracts he and Weiner had with Krear, and testified that if contributions to the Funds increased in accordance with projections made by Krear and the Funds, Krear's profits over the life of the Contracts would have come to $839,511. On cross-examination, he testified that if the projected increases in contributions were not forthcoming, and Krear were entitled only to the minimum payments specified in the Contracts, Krear's losses as a result of the breach would total $269,400.
 
 
 12
 In support of their conspiracy, excessive fee, and breach of fiduciary duty contentions, the Trustees elicited testimony from their own and Krear's witnesses concerning the rates of compensation received by other administrators of pension or welfare funds. This evidence included testimony by Mozer and the administrator of the International's own pension funds as to the latter's compensation, and the testimony of two of the Trustees about other administrators' fees.
 
 
 13
 In addition, the Trustees proposed to call one Hugh Brookhart to testify as an expert witness that other administrative service companies had been available to the Funds and that, based on their compensation rates, Krear was charging excessive fees. Brookhart was also to testify that, based on his review of Krear's computerization plans for the Funds, Krear had not been performing under the Contracts. The district court excluded Brookhart's proposed testimony on the grounds that it was "totally irrelevant" and not "of assistance to the trier of fact." The Trustees also proposed to ask attorney Richard Raysman to testify, as an expert witness, that the Contracts were unenforceable because they lacked essential terms. The district court also excluded this proposed testimony.
 
 
 14
 At the close of the evidence, the Trustees moved, in effect, for a directed verdict in their favor on the claims of Krear, contending that Krear's damages were entirely speculative. The court denied the motion and submitted a special verdict form to the jury.
 
 
 15
 The jury found that the Trustees were liable to Krear for breach of contract in the amount of $269,400 and found for Krear on the Trustees' counterclaims. It found that neither Grauso nor Mozer was liable to the Trustees for any of the damages payable to Krear, and it found that the Trustees were liable to Grauso for breach of contract in the amount of $42,000. The court awarded prejudgment interest to Krear and Grauso and entered judgment in their favor in the amounts of $363,183 and $53,104, respectively. The court ruled that the issue of attorneys' fees would be decided in separate proceedings.
 
 
 16
 The Trustees immediately attempted to appeal various of the trial court's rulings. Since the claim for fees, which was part of Krear's contract claim, had not been adjudicated, we dismissed the appeal for lack of a final judgment for the reason stated in F.H. Krear & Co. v. Nineteen Named Trustees, 776 F.2d 1563.
 
 C. The Trial on Attorneys' Fees
 
 17
 In the ensuing fees proceedings, the parties waived their rights to a jury trial and submitted the matter to the court on the basis of depositions, documents, and oral argument. After reviewing the evidence, which we discuss in greater detail in Part II.C. below, as to Krear's attorneys' hours, services, record-keeping, and experience, the court awarded Krear and its attorneys a total of $435,218.75 in fees plus $17,601.89 in expenses, stating as follows:
 
 
 18
 [T]he Court is intimately aware that Krear's attorneys were forced to pursue claims against extremely dilatory tactics by the Trustees. These tactics included asserting a wholly frivolous conspiracy defense, frivolous counterclaims, and several frivolous third-party claims.... Their conduct throughout these proceedings, and, in particular, during the needlessly protracted trial and in opposing the instant motion, has been so unjustifiable that the Court would be compelled to award virtually the same amount of fees as Rule 11 sanctions if the contracts in question did not provide for an award of attorneys' fees.
 
 
 19
 The court noted that it was "fully aware" that the attorneys' fees award exceeded the amount of the judgment obtained by Krear and concluded that the fee award was proper "in light of the Trustees' conduct." A final judgment was entered, and this appeal followed.
 
 II. DISCUSSION
 
 20
 On this appeal, the Trustees pursue the issues they sought to argue in their earlier appeal prior to its dismissal. As to these issues, the Trustees contend principally that the trial court erred in (1) limiting their recross-examination of John Krear, (2) excluding their proposed expert witness testimony, (3) refusing to instruct the jury that Krear and Mozer were, as a matter of law, fiduciaries under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1002(21)(A) (1982), (4) denying their motion for a directed verdict on Krear's claim on grounds of insufficiency of the proof as to damages, (5) denying their motion for a new trial on the grounds that inflammatory statements and summation by Krear's counsel at the jury trial denied them a fair trial, and (6) awarding Krear prejudgment interest. In addition, the Trustees contend that the district court's award of attorneys' fees was improper under New York law. We find merit only in the last of these contentions.
 
 A. The Alleged Errors During the Jury Trial
 1. The Recross-examination of John Krear
 
 21
 On direct examination, John Krear testified with respect to Krear's anticipated profits on the Contracts and described the employment contracts he and Weiner had with Krear. The Trustees cross-examined John Krear with respect to Krear's prospects but not with respect to the employment contracts. Following the close of John Krear's redirect examination, which did not include questions regarding the employment contracts, those contracts were received in evidence. When the Trustees conducted recross-examination they attempted to question John Krear with respect to the validity and authenticity of those agreements. The district court sustained objections to these questions on the grounds that they were not "within the parameters of redirect." The Trustees contend that this ruling was error. We disagree.
 
 
 22
 Fed.R.Evid. 611(b) provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness"; it gives the trial court discretion to permit additional latitude in cross-examination. Thus, "the proper scope for cross-questioning is, like the qualification of witnesses, a matter of trial court discretion which we do not lightly disturb." N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp., 590 F.2d 415, 421 (2d Cir.1978). This deferential standard of review is equally applicable to recross-examination. See United States v. Kahn, 472 F.2d 272, 281 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973).
 
 
 23
 Since the redirect examination of John Krear did not include questioning with respect to the employment agreements, it was plainly not error for the district court to exclude the Trustees' recross-examination questions on that subject.
 
 2. The Exclusion of Expert Testimony
 
 24
 The Trustees contend that the district court erred in excluding the proffered expert testimony as to Krear's performance, comparable administrative fees, and the enforceability of the Contracts. We find no basis for reversal.
 
 
 25
 Rule 702 of the Federal Rules of Evidence provides that an expert may testify to specialized knowledge that may assist the trier of fact in determining a factual issue. Rule 403, however, permits the trial judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. Thus, "the trial judge has broad discretion in the matter of admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); see also N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp., 590 F.2d at 418 (Rule 702, broadening "the range of admissible expert testimony," does not alter the "manifestly erroneous" standard of review). In the present case, the district court's exclusion of the Brookhart and Raysman testimony was within the proper bounds of discretion and was not manifestly erroneous.
 
 
 26
 According to the Trustees' offer of proof, Brookhart was to testify that Krear had not computerized the Funds as required by the Contracts. However, Krear's proposal and Grauso's recommendation showed that the parties understood that computerization of the Funds pursuant to the Contracts would not be immediate, but instead would be implemented over approximately eight-to-twelve months. Cf. Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir.1965) (under New York contract law, all writings from a single transaction must be read together). The Trustees claimed that Krear's breach had occurred after less than four months. Although Brookhart was to have testified that there were defects in the computerization plan, the offer of proof did not suggest that such defects would not have been curable in the remaining four-to-eight months anticipated for Krear's performance had the Trustees not ceased paying Krear and barred it from the Funds' offices. The district court thus did not abuse its discretion in excluding Brookhart's nonperformance testimony as "irrelevant" and misleading.
 
 
 27
 Nor did the court abuse its discretion in excluding Brookhart's proposed testimony as to the excessiveness of the administrative fees charged by Krear in comparison to the fees charged by other companies. In light of the testimony of at least four other witnesses as to administrative fees they charged or of which they had knowledge, Brookhart's testimony would have been cumulative.
 
 
 28
 Finally, the district court did not err in excluding Raysman's proposed testimony that the Contracts were unenforceable for lack of essential terms. "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509-10 (2d Cir.) (admission of expert testimony as to party's contractual obligations constituted reversible error), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).
 
 
 29
 3. The Instruction With Regard to ERISA Fiduciaries
 
 
 30
 One of the Trustees' defenses to Krear's claim was that the Contracts were unenforceable under ERISA because Krear was an ERISA fiduciary, and its allegedly excessive fees violated the ERISA requirement that fiduciaries charge "no more than reasonable compensation" for their services. 29 U.S.C. Sec. 1108(b)(2) (1982). They also contended that Mozer was an ERISA fiduciary and thus was liable for having caused the Funds to agree to pay Krear excessive compensation. They asked the district court to instruct the jury that Krear and Mozer were ERISA fiduciaries of the Funds as a matter of law. The court declined and instead instructed the jury as follows:
 
 
 31
 I instruct you that as a matter of law, the Trustees were all fiduciaries of all three funds. You must consider whether the Trustees have proved, by a preponderance of the evidence, that Krear & Company, Grauso and/or Mozer were fiduciaries.
 
 
 32
 The court explained the requirements of ERISA, and continued:
 
 
 33
 The Trustees assert that one of the ways Krear & Company breached its fiduciary duty was by charging excessive fees. You must find that the Trustees have proved, by a preponderance of the evidence, that Krear & Company was, in fact, a fiduciary, and if so, that it breached its fiduciary duty to the funds....
 
 
 34
 On appeal, the Trustees contend that this instruction was erroneous and that the court should have given the instruction they requested. We disagree because the evidence in the record did not establish that either Krear or Mozer was, as a matter of law, an ERISA fiduciary with respect to Krear's rate of compensation.
 
 ERISA defines a "fiduciary" as follows:
 
 35
 [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 36
 29 U.S.C. Sec. 1002(21)(A) (1982). Under this definition, a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only "to the extent" that he has or exercises the described authority or responsibility.
 
 
 37
 When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him. Such a person is not an ERISA fiduciary with respect to the terms of the agreement for his compensation. See, e.g., Schulist v. Blue Cross, 717 F.2d 1127, 1131-32 (7th Cir.1983):
 
 
 38
 Before entering into the Contract which included the rates alleged to have provided it with unreasonable compensation, BC/BS [Blue Cross/Blue Shield] had no relationship to the Trust at all.
 
 
 39
 ... BC/BS had no control over what plan and what hospital service organization were chosen for the Trust. After the Contract was signed, BC/BS may have come into a fiduciary relationship to the Trust with respect to the processing of claims, the area over which BC/BS had discretionary authority.... As to the terms and conditions upon which it became a provider, therefore, BC/BS entered into an arm's length bargain presumably governed by competition in the marketplace.... BC/BS was not a fiduciary under ERISA with respect to ... its compensation....
 
 
 40
 On the other hand, after a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation. See Sixty-Five Security Plan v. Blue Cross & Blue Shield, 583 F.Supp. 380, 387-88 (S.D.N.Y.1984) (Blue Cross was a fiduciary with respect to its own compensation where its fees were based on a percentage of claims paid, and Blue Cross had complete discretion and control over what claims would be paid).
 
 
 41
 The district court's instructions to the jury were consistent with these principles. While Krear may have become an ERISA fiduciary at some point after entering into the Contracts, it plainly held no such status prior to the execution of the Contracts, for it had no relationship with the Funds and no authority or responsibility for the terms under which the Trustees would retain it. Thus, the court properly rejected the Trustees' request for an instruction that Krear had been an ERISA fiduciary with respect to its compensation as a matter of law.
 
 
 42
 Nor would it have been appropriate for the court to charge that Mozer, the Funds' attorney, was, as a matter of law, an ERISA fiduciary with respect to Krear's compensation. Although generally "[a] lawyer's duty to his client is that of a fiduciary or trustee," Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1386 (2d Cir.1976), an attorney for an ERISA-governed fund is not necessarily a "fiduciary" for all purposes within the meaning of ERISA, a fact recognized in the Department of Labor's regulations promulgated under ERISA:
 
 
 43
 [A]n attorney, accountant, actuary or consultant who renders legal, accounting, actuarial or consulting services to an employee benefit plan ... [is not] a fiduciary to the plan solely by virtue of the rendering of such services, absent a showing that such consultant (a) exercises discretionary authority or discretionary control respecting the management of the plan, (b) exercises authority or control respecting management or disposition of the plan's assets, (c) renders investment advice for a fee, direct or indirect, with respect to the assets of the plan, or has any authority or responsibility to do so, or (d) has any discretionary authority or discretionary responsibility in the administration of the plan.
 
 
 44
 29 C.F.R. Sec. 2509.75-5 (1986).
 
 
 45
 In the present case, Mozer participated in negotiating the fee term of the contracts with Krear, but the record does not indicate that he had either the authority or the responsibility to determine what amount the Trustees were willing to pay. In light of the evidence of record, the district court did not err in refusing to rule that Mozer was a fiduciary as a matter of law and instead treating that question as one of fact for the jury.
 
 4. The Adequacy of the Proof of Damages
 
 46
 The Trustees contend that Krear's proof of damages was insufficient to support the jury's verdict because the claim of lost profits of the new corporation was entirely speculative and the John Krear and Weiner employment contracts were improperly submitted to the jury as evidence of damages. We find no merit in these contentions.
 
 
 47
 The fact that a business has not been long established does not mean that its projected profits are unduly speculative, see Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 455 (2d Cir.1977) (applying New York law and finding damages not too speculative when based on lost profits of business that had not yet begun), so long as "there is a rational basis on which to calculate the lost profits," Perma Research & Development Co. v. Singer Co., 402 F.Supp. 881, 898 (S.D.N.Y.1975), aff'd, 542 F.2d 111 (2d Cir.), cert. denied, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976); see also Kenford Co. v. County of Erie, 108 A.D.2d 132, 140-41, 489 N.Y.S.2d 939, 946 (4th Dep't 1985), aff'd, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986). When the plaintiff has presented evidence of the minimum and maximum amounts it expected to receive pursuant to a written contract and evidence as to payments it has obligated itself to make, it lies well within the trial court's discretion to submit the issue of lost profits to the jury, and the jury has " 'a large amount of discretion in determining the amount of its verdict.' " Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d at 456 (quoting 5 Corbin on Contracts, Sec. 1022, at 146 (1964)).
 
 
 48
 Here, Krear presented evidence of, inter alia, the actual profits it made in the four months prior to the termination of the Contracts, a projection of total profits it expected over the life of the Contracts, based on its four-month experience, and the employment contract expenses to which it had contractually obligated itself even if it made no profit from the Contracts. The court was well within the proper bounds of discretion to submit the damages issue to the jury. The jury awarded $269,400, an amount closely related to the compensation that Krear had bound itself to pay its two executives; this award was within the jury's discretion.
 
 
 49
 5. Krear's Inflammatory Summation and References To Pitta
 
 
 50
 The Trustees contend that they were denied a fair trial because of Krear's inflammatory summation and its repeated references to Vito Pitta, who had recently been indicted on highly publicized charges of involvement with organized crime. We find no abuse of discretion in the court's denial of a new trial on these grounds.
 
 
 51
 The references during the trial to Pitta were hardly gratuitous. They were part of Krear's development of its main theory that the Trustees had breached the Contracts because the political struggle between the International and Local 69 had ended in the International's victory and the merger of Local 69 into Local 6, which was headed by Pitta. For example, Krear's counsel argued that
 
 
 52
 [o]ne of the most critical pieces of evidence in this case is the testimony of Mr. Mozer as to a conversation that he had with Vito Pitta....
 
 
 53
 [A]ccording to Mr. Mozer's testimony, Mr. Pitta told him ... that the 69 [F]unds were going to be transferred to the International....
 
 
 54
 The fact that Pitta had recently been indicted in connection with alleged organized crime activities did not preclude the mention of his name in the present case.
 
 
 55
 Nor are we persuaded that the Krear summation was, in light of the record as a whole, unduly prejudicial. The portion of the summation here challenged by the Trustees was as follows:
 
 
 56
 [Y]ou are going to be given the privilege of doing the right thing.... Too often, the people with the wealth and the power to do the right thing, Chicago officials with enormous trust funds, henchmen in New York, ... don't always act with decency and with justice, and according to principles. They crush their political rivals, they destroy the small businesses that try to compete with them. They don't do the right thing, they try to fix things, take care of things. They send lawyers out to make threats ... and they abuse people, they sneer at people, they--[.]
 
 
 57
 At that point, the court interrupted and, in a conference at the bench, admonished Krear's attorney as follows: "I have asked the attorneys to use discretion, please. I want you to abide by what I am requesting." No further summation of this type occurred.
 
 
 58
 Although the quoted part of the summation was inflammatory, it did not suffice to warrant granting the Trustees a new trial. Indeed, Krear's summation statements may well have been invited by the Trustees' own intemperate summation, which had argued that Krear, Grauso, and Mozer sought to get rich by taking money out of the pockets of the workers, and that their actions had a "bad smell":
 
 
 59
 I ask you, ladies and gentlemen of the jury, do you have a bad smell from this? Was this an arm's-length contract in its inception? Was it performed? Did they know what they were doing, even? Did they care? ... [T]hey want to take Pension and Welfare money out of the pocket[s] of workers and get rich on it.
 
 
 60
 The Trustees' summation was, of course, no excuse for Krear's counsel's improper references to "henchmen," "threats," "fix[ing]," and the like. The trial court, however, properly called a swift halt to such invective, and we cannot say that these statements constituted prejudicial error.
 
 B. The Award of Prejudgment Interest
 
 61
 The Trustees contend that the district court erred in awarding Krear prejudgment interest of $93,783, arguing that an interest award was not warranted because John Krear and Weiner, in their employment contracts with Krear, waived any claims they might have against Krear for interest on the sums due them. This argument need not detain us long, for the right of Krear to an award of prejudgment interest was not determined by the boundaries of its contractual obligations to nonparties. Rather, Krear was entitled to such interest as a matter of law. New York law provides that such interest "shall" be recovered, N.Y.Civ.Prac.Law Sec. 5001(a) (1963), and the failure of the court to award the interest would have constituted reversible error. Julien J. Studley, Inc. v. Gulf Oil Corp., 425 F.2d 947 (2d Cir.1969).
 
 C. The Award of Attorneys' Fees
 
 62
 Finally, we turn to the only troublesome part of the judgment below, the district court's award to Krear and its attorneys of $452,820 in fees and expenses. The award was premised on the Contracts' provision that in the event of litigation, the "prevailing party" would "have the right to reimbursement of reasonable attorney's fees." In the wake of the jury's $269,400 verdict in its favor, Krear sought to recover a total of approximately $575,000 as awards for the three sets of attorneys who had represented it in the present action. The court awarded fees of $435,219 and expenses of $17,601. We conclude that each of these amounts must be reduced.
 
 
 63
 For Harvey M. Katz, Krear's lead counsel, Krear sought a total of $356,734, consisting of $227,769 as fees based on time spent, plus $113,884 as a "50% multiplier" because the Trustees had caused the litigation to be unnecessarily protracted and complex, plus some $15,000 in expenses. Katz submitted affidavits with time sheets showing that since October 1979 he had spent 1,688.75 hours in the present litigation, including 14 hours on the fee motion. He requested $295,356 in fees. Krear's motion did not explain the reason for the discrepancy between Katz's figure and its own request which, without the proposed $114,000 multiplier was some $66,000 lower than Katz's and with the multiplier was some $48,000 higher. Katz's request for $295,356 was based on his then-current billing rate of $175 per hour; Krear had no written retainer agreement with Katz, and Katz testified that as his billing rates rose from $125 to $150 to $175 per hour over the years, Krear orally agreed to pay on the basis of his highest rate, retroactive to October 1979. Katz could not remember precisely when his rate increases occurred. His time records consisted of terse written descriptions of the work done, which he testified had usually been prepared at the end of a month or two-week period in which there had been major activity in the case, from notes or "little scribbles on [his] research papers."
 
 
 64
 For the firm of Baden, Kramer, Huffman & Brodsky, P.C. ("Baden"), whose partner Douglas J. Kramer had begun working on the present case several months after it was commenced, Krear initially sought a total award of some $209,000, consisting of $138,000 in fees for time spent, $69,000 as a multiplier, and $1,700 in expenses. Baden later added a claim for 31.2 hours spent on the fee motion, bringing its claim for fees, without multiplier, to $143,838. The amount requested for Baden was based on its 1984-1985 fee schedule, which billed partners' time at $175 per hour. Krear had no written retainer agreement with Baden for the present action, though it did have a contingent fee agreement in a related case which provided that Baden would be paid one-third of any recovery that was obtained. As discussed in greater detail in Part II.C.2 below, Kramer testified at his deposition that he did not keep careful records distinguishing between these two cases and that most work that was applicable to both cases was charged only to the present one.
 
 
 65
 For the firm of Levy, Gutman, Goldberg & Kaplan ("Levy"), Krear sought a total award of $9,100, consisting of $5,675 in fees for time spent, some $2,800 as a multiplier, and $630 in expenses.
 
 
 66
 The Trustees opposed the fee application on many grounds. They contended, inter alia, that (1) since the jury had fixed Krear's damages by reference to the amount Krear was obligated to pay its executives under their employment contracts, Krear was not really a "prevailing party" within the meaning of the Contracts; (2) under New York law, the fee should not exceed the amount recovered; (3) the agreement by Krear to pay Katz retroactively in accordance with its highest rates was unreasonable; (4) since Baden did not keep records that distinguished the time it spent on the present case from that spent on the related contingent fee case, it was not entitled to a fee in this case; (5) Katz's time records were inadequate to substantiate a fee award in the amount requested; and (6) Krear was not entitled to recover fees for time spent in seeking the fee award.
 
 
 67
 The district court rejected all of these arguments, terming them "nothing but frivolous objections." Reducing the award to some extent for time claims or expenses that were completely unsubstantiated by the attorneys' written records, and rejecting the request for a multiplier, the court ordered the Trustees to pay a total of $452,820 in attorneys' fees and expenses to Krear and its attorneys: $285,731 in fees and $15,693 in expenses for Katz; $143,838 in fees and $1,908 in expenses for Baden; and $5,650 in fees for Levy. The court found that the litigation had been of "substantial benefit" to Krear and that the quality of advocacy by Krear's attorneys had been "extremely high and professional," and concluded that the time of both Katz and the Baden partners should be compensated at the rate of $175 per hour retroactively. The court stated that time spent on the fee motion would be compensated to the extent of 31.2 hours by Baden and 14 hours by Katz. It concluded that fees in excess of the amount of Krear's recovery were justified because the litigation had been needlessly prolonged by the dilatory and frivolous tactics of the Trustees, including their counterclaims, their protraction of the trial, and their objections to the amounts of fees sought by Krear.
 
 
 68
 On appeal, the Trustees, renewing most of the arguments they made to the district court, contend that the fees awarded by the district court were unreasonable. Though we agree with the district court that the Trustees' contention that Krear is not a prevailing party--one of the most frivolous arguments we have encountered--does not warrant discussion, we find considerable merit in several of their other contentions.
 
 
 69
 As a general matter of New York law, which the Contracts provided was to govern, when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable. As stated by the New York Court of Appeals in Equitable Lumber Corp. v. IPA Land Development Corp., 38 N.Y.2d 516, 524, 381 N.Y.S.2d 459, 465, 344 N.E.2d 391, 397 (1976), "[w]hile plaintiff may enter into any fee arrangement it wishes with counsel, it should not be permitted to manipulate the actual damage incurred by burdening the defendant with an exorbitant fee arrangement." Thus, the court stated, "it may be necessary to look beyond the actual fee arrangement between plaintiff and counsel to determine whether that arrangement was reasonable," id. at 521, 381 N.Y.S.2d at 463, 344 N.E.2d at 395, or whether it was grossly disproportionate to the arrangement the plaintiff would have been expected to make with counsel in the absence of a fee-shifting agreement, see id. at 524, 381 N.Y.S.2d at 465, 344 N.E.2d at 397. See also First National Bank of East Islip v. Brower, 42 N.Y.2d 471, 474, 398 N.Y.S.2d 875, 877, 368 N.E.2d 1240, 1242 (1977).
 
 
 70
 A variety of factors informs the court's determination of whether a requested amount of attorneys' fees is reasonable or unreasonable, including "the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the Bar for similar services; and the amount involved." In re Schaich, 55 A.D.2d 914, 914, 391 N.Y.S.2d 135, 136 (2d Dep't), appeal denied, 42 N.Y.2d 802, 397 N.Y.S.2d 1026, 366 N.E.2d 293 (1977). In general, the court uses a "lodestar" method, in which "the hours reasonably spent by counsel, as determined by the Court, [are] multiplied by the reasonable hourly rate." Zauderer v. Barcellona, 130 Misc.2d 234, 236, 495 N.Y.S.2d 881, 882-83 (Civ.Ct.1985). The lodestar analysis is, however, tempered by a policy requiring that contractual provisions for the payment of attorneys' fees be strictly construed, and general language will not be sufficient to warrant an award for a type of expense that is not customarily reimbursed. See, e.g., Swiss Credit Bank v. International Bank, Ltd., 23 Misc.2d 572, 200 N.Y.S.2d 828 (Sup.Ct.1960) ("Swiss Credit Bank "); Zauderer v. Barcellona, 130 Misc.2d at 237, 495 N.Y.S.2d at 883. The New York courts' interpretation of these principles has application to the present case in several respects.
 
 1. The Amount Involved in the Case
 
 71
 Although the district judge found that the services of its attorneys "secured a substantial benefit for Krear," it does not appear that she gave appropriate consideration to what is apparently the general rule in New York, i.e., that it is rarely proper to award fees in an amount that exceeds the amount involved in the litigation.
 
 
 72
 New York courts have stated that, as a general rule, they will rarely find reasonable an award to a plaintiff that exceeds the amount involved in the litigation. See Colon v. Automatic Retailers Association Service, Inc., 74 Misc.2d 478, 486, 343 N.Y.S.2d 874, 883 (Civ.Ct.1972) (award of fees "in excess of the amount involved in a litigation would normally appear to be unreasonable"). Exceptions to this general rule may be made where the court finds that the benefits of the litigation reached far beyond the amount sought in the immediate suit, such as in "cases where there are transcending principles involved which make it economically feasible and reasonable." Id. at 487, 343 N.Y.S.2d at 883 (giving as one example an action to recover rent or other payment under a lease, where the action would be determinative of the validity of the lease); see also Simmons v. Government Employees Insurance Co., 59 A.D.2d 468, 472-73, 400 N.Y.S.2d 99, 101 (2d Dep't 1977).
 
 
 73
 In the present case, the benefit secured for Krear on its own claim was no more than $363,183, i.e., the $269,400 awarded by the jury plus the prejudgment interest awarded by the court. The court did not make any finding that an important matter of principle was involved, or that there was any other applicable exception to New York's general rule, that would justify a fee associated with this claim in excess of the $363,183 recovered. Further, a contract provision for a "reasonable" attorneys' fee does not suggest that the parties envisioned that a prevailing plaintiff would be entitled to fees exceeding or even approaching the amount of its recovery. We note that the New York Court of Appeals in Equitable Lumber Corp. v. IPA Land Development Corp., 38 N.Y.2d at 524, 381 N.Y.S.2d at 465, 344 N.E.2d at 397, did not consider even a 30% fee to be per se reasonable and remanded for consideration of what arrangement that plaintiff would have made absent a fee-shifting agreement. In the present case, in light of the one-third contingent fee arrangement this plaintiff in fact made with Baden for other litigation involving the Contracts at issue here, we find it surpassingly difficult to justify an award, in connection with Krear's claim against the Trustees, of more than one-third of the $363,183 recovered, or $121,061.
 
 
 74
 This is not the extent of the fees that could properly be awarded to Krear, however, since Krear was also the prevailing party on the Trustees' counterclaims. These counterclaims sought $158,476 in compensatory damages plus three times that amount in punitive damages. In light of the emphasis by both Krear and the district court on the counterclaims' frivolity, however, it is appropriate to disregard the request for punitive damages in determining the monetary value of the benefit secured by counsel by defeating the counterclaims. In analyzing what might be a reasonable fee for defending the counterclaims, we note that it is rare that a party defendant is able to retain counsel on a contingent fee basis, and ordinarily such a party is billed for time spent. Nonetheless, it is not reasonable to assume, unless significant matters of principle were involved, that a defendant would ordinarily be willing, in the absence of a fee-shifting provision, to incur liability for attorneys' fees in excess of the amount of its exposure in the lawsuit. Since there was no finding here that principle was involved, we conclude that a reasonable fee for the defense of the counterclaims could not exceed the amount the Trustees sought in compensatory damages, i.e., $158,476.
 
 
 75
 Having determined the maximum amounts that could properly have been awarded with respect to Krear's claim and its defense against the counterclaims, we turn to questions of whether the number of hours reflected in counsel's records, multiplied by the appropriate billing rates, rose to those maxima. We conclude that the fee award credited counsel with excessive amounts of time, at inflated hourly rates, and that less than the maximum should have been awarded with respect to the counterclaims.
 
 2. Appropriate Time and Labor
 
 76
 In determining whether a requested fee is justified by the time and labor expended, the New York courts make their own assessments of the reasonableness of the amount of time spent on the case. Zauderer v. Barcellona, 130 Misc.2d at 236, 495 N.Y.S.2d at 882-83. The burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested. See, e.g., Jordan v. Freeman, 40 A.D.2d 656, 656-57, 336 N.Y.S.2d 671, 671-72 (1st Dep't 1972) (reducing award from $12,000 to $6,000, stating that "[t]he record le[ft] much to be desired regarding the actual time spent since [the attorney] testified that he did not keep a diary nor did he keep time records and his estimate of time spent was based upon a review of his files"); In re Ury, 108 A.D.2d 816, 816-17, 485 N.Y.S.2d 329, 330 (2d Dep't 1985) (reduction of attorney's fee from $30,000 to $13,000 upheld in a surrogate proceeding because there was no "categorical breakdown" of services); In re Schaich, 55 A.D.2d at 914, 391 N.Y.S.2d at 136 (fee reduction in surrogate proceeding upheld where "there existed no written day-by-day record of the time spent"); cf. New York State Association for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147 (2d Cir.1983) (announcing a requirement for statutory attorneys' fee cases, similar to that of New York law for contractual fee cases, that "accurate" and "contemporaneous time records are a prerequisite for attorney's fees in this Circuit").
 
 
 77
 There are two principal respects in which Krear's attorneys' record-keeping practices impeded a precise calculation of the hours reasonably spent in representation of Krear in the present action.
 
 
 78
 First, the time records submitted to the district court by Levy, Katz, and Baden did not contain sufficient detail to reveal what proportion of their time was spent in pursuit of Krear's own claim and what was devoted to defense of the counterclaims. Katz's time sheets, for example, customarily described his activities in no more than two or three words for any given day, such as "Rev. Docs" or "Clients re testimony." Baden's records are little better.
 
 
 79
 For a number of reasons, we assume that a substantial amount of time was spent by the attorneys in connection with the counterclaims. Krear's breach of contract claim against the Trustees was relatively straightforward. Suit was commenced, discovery was initiated, and Krear moved for summary judgment less than a year later. The Trustees asserted, inter alia, that there were material issues of fact in connection with their defenses and counterclaims, and the motion was denied; discovery continued for more than three years. A substantial amount of trial time was devoted to the Trustees' efforts to prove that the Contracts had resulted from a conspiracy among Krear, Grauso, and Mozer. In awarding fees, the district judge was extremely critical of the Trustees for protracting the litigation; one of the facts she mentioned was interposition of the counterclaims. Thus, it appears that the counterclaim issues required a not insignificant amount of time, though doubtless not all of the time by which the litigation was prolonged, for the court mentioned other factors as well. In the absence of more informative record-keeping by Krear's attorneys, we ascribe to the defense of the counterclaims one-third of the total hours (after deducting time spent in connection with the fee application, see Part II.C.3. below) recorded by Krear's attorneys.
 
 
 80
 The second respect in which the record-keeping was deficient concerns only the pre-1984 services of the Baden firm, which was originally retained by Krear on a contingent fee basis to represent it in a related action involving these Contracts, Krear v. Pitta, 80 Civ. 6557 (S.D.N.Y.) (dubbed "Krear II" in the depositions relating to the fee application), and later began working on the present case ("Krear I" ) on a "time-spent" fee basis. The Trustees argued that Krear was not entitled to recover any fees for Baden prior to the Trustees' being given notice that Baden was becoming counsel in Krear I. While we reject this notion, we are nonetheless concerned by the fact that, according to Kramer's deposition, Baden "did not follow anything terribly consistent" in distinguishing the hours spent in connection with the present case from those spent on Krear II. The coexistence of two related matters, one accepted on a contingent fee basis and one on a time-spent basis, creates the possibility that counsel may enjoy a windfall if it has billed a disproportionate amount of the common time to the case in which it is to receive the hourly rate. The potential for such a windfall in the present case was vividly established by the Kramer deposition. Kramer testified that the retainer agreement in Krear II provided that Baden would not receive payment for time spent on that case but would receive one-third of any recovery therein, or in any event a minimum of $20,000 or $30,000. Thereafter, in connection with motion practice and pretrial discovery that was pertinent to both cases, Baden proceeded to ascribe most of its services to Krear I, not to Krear II. For example, when it moved to consolidate the two cases, all time was billed to Krear I, none to Krear II; when Kramer attended depositions that were pertinent to both cases, all time was billed to Krear I, none to Krear II. Kramer testified candidly as follows:
 
 
 81
 I didn't tend to keep much Krear II time because it was a contingency case. It didn't make much difference what time I spent on it.
 
 
 82
 Baden sought compensation in the present case for all of the time it had ascribed to Krear I, much of which was applicable to both cases. Indeed, some of this time was revealed at the Kramer deposition to be applicable only to Krear II. The district court thus erroneously rejected the Trustees' contention that some of Baden's charges in the present case included time more appropriately ascribable to Krear II as "sheer speculation." The Trustees' objection was strongly justified by Kramer's deposition testimony. To the extent that any work was devoted to the prosecution of more than one case, New York law, which discourages any sort of manipulation to increase the fee burden of the losing party, must be construed as requiring that only the pertinent fraction of the time charges for that work be compensated by a fee award in the case in which the parties have agreed that the loser will pay the victor's attorneys' fees.
 
 
 83
 Accordingly, we conclude that Baden may properly be compensated in the present action for no more than one-half of its non-counterclaim services rendered prior to 1984. The remaining non-counterclaim time, which is properly ascribable to Krear II, is not compensable in this lawsuit.
 
 3. Customary Charges
 
 84
 In two respects, the fees awarded were excessive because they were not limited to fees that are customarily charged or recoverable.
 
 
 85
 First, a general contract provision for the shifting of attorneys' fees does not authorize an award of fees for time spent in seeking the fees themselves. This is so whether that time is spent in a separate lawsuit, see, e.g., Doyle v. Allstate Insurance Co., 1 N.Y.2d 439, 444, 154 N.Y.S.2d 10, 14, 136 N.E.2d 484, 487 (1956) ("legal expenses ... beyond the taxable costs ... are not recoverable as general or special damages"); Swiss Credit Bank, 23 Misc.2d at 573-74, 200 N.Y.S.2d at 830-31, or in the latter stages of the very litigation in which the fee expense was incurred, see Zauderer v. Barcellona, 130 Misc.2d at 237, 495 N.Y.S.2d at 883 ("[a]ttorney's fees incurred in proceedings to collect attorney's fees are not recoverable"). As stated in Swiss Credit Bank,
 
 
 86
 [a] general agreement for the payment of counsel fees does not generally include counsel fees in the suit to collect those fees (Doyle v. Allstate Ins. Co., 1 N.Y.2d 439, 154 N.Y.S.2d 10 [136 N.E.2d 484]. Of course, it is possible to contract for such an allowance but, as it is an agreement contrary to what is usual, specific language would be needed to show such an agreement.
 
 
 87
 23 Misc.2d at 573-74, 200 N.Y.S.2d at 830-31.
 
 
 88
 The district court failed to apply this principle. The Contracts' provision for attorneys' fees was a general one, providing, without elaboration, that the prevailing party would "have the right to reimbursement of reasonable attorney's fees"; there was no specific language to indicate that time spent in justifying a fee application was to be included. Since reimbursement for such time is not customary, the district court's conclusion that this part of Krear's request "clearly falls within" the Contracts was contrary to New York law.
 
 
 89
 We also find unjustified the district court's enforcement against the Trustees of Krear's oral agreement to pay Katz amounts based not on the rates he charged at the time the work was done but on the higher rates he was charging by the end of the litigation. The court awarded similarly retroactive higher fees for Baden even without evidence of such an agreement between Krear and Baden. Krear urged that the higher rates be awarded retroactively to both Katz and Baden as a simplified way of awarding them interest on their fees. The court accepted this argument, noting that the lawsuit had been pending for several years, that the attorneys had not been paid during that time, and that retroactivity would "adjust for the effects of inflation." This justification finds no support in the Contracts or in New York law.
 
 
 90
 No basis appears in the record for believing that it is customary for clients to pay their attorneys for past services, done at lower rates, more than they would have paid had their bills been paid contemporaneously with such services. Certainly we are aware of no custom by which a penurious firm such as Krear, whose only significant asset was its breach-of-contract claim, would agree to increase its fee obligation retroactively in the absence of a fee-shifting expectation. Nor is retroactivity justifiable on the basis that it is tantamount to an award of interest. The Contracts did not provide that the prevailing party would be entitled to interest on any payments made to its attorneys during the course of the litigation, and such a term should not be inferred absent specific language clearly indicating that this was the parties' intent. Further, so far as the record reveals, the initial retainer agreements between Krear and its attorneys did not call for Krear to pay the attorneys interest on bills unpaid; and as a matter of professional ethics, an attorney may not properly charge his client interest on unpaid bills unless, inter alia, the interest charges are reasonable and he has advised the client of such charges prior to rendering any services. See Committee on Professional Ethics, New York State Bar Association, Opinion # 399, Interest on delinquent accounts, 47 N.Y.St.B.J. 433 (1975).
 
 
 91
 In the circumstances, we think the New York courts would view Krear's belated oral agreements to pay its attorneys retroactively at ever increasing rates as an impermissible "manipulat[ion of] the actual damage incurred," Equitable Lumber Corp. v. IPA Land Development Corp., 38 N.Y.2d at 524, 381 N.Y.S.2d at 465, 344 N.E.2d at 397, resulting in an unwarranted burden on the defendants to which the parties did not in fact agree.
 
 4. The Rule 11 Alternative
 
 92
 In explicitly recognizing that its fee award exceeded the amount recovered by Krear, the district court stated that it would be "compelled to award virtually the same amount of fees as Rule 11 sanctions if the contracts in question did not provide for an award of attorneys' fees." We have considered whether the fee award is sustainable as a proper Rule 11 sanction and have concluded that it is not.
 
 
 93
 Notwithstanding the district court's reference to Fed.R.Civ.P. 11, the court made no findings that would have supported the imposition of sanctions under that Rule. When the litigation was commenced and the counterclaims were interposed, Rule 11 allowed the imposition of sanctions when a pleading had been signed in bad faith. Though the court characterized the counterclaims as frivolous, it did not state that the Trustees had filed their answer or any other pleading in subjective bad faith. Indeed, the conduct the court found "particular[ly] ... unjustifiable" apparently was not the signing of any given pleading but rather was the needless protraction of the trial and the opposition to the fee application. The general statement that the Trustees' counterclaims and other tactics were frivolous does not constitute an adequate finding that any pleading was signed in subjective bad faith.
 
 
 94
 As of August 1, 1983, Rule 11 was amended to provide that
 
 
 95
 [t]he signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
 
 
 96
 The revised Rule provides for sanctions "when it appears that a competent attorney could not form the requisite reasonable belief as to the validity of what is asserted in" a pleading, motion, or other paper signed by a party or his counsel. Oliveri v. Thompson, 803 F.2d 1265, 1275 (2d Cir.1986); see Eastway Construction Corp. v. City of New York, 762 F.2d 243, 254 (2d Cir.1985). Although the amendment expanded the category of litigation papers encompassed by the Rule and eliminated the requirement of a finding of subjective bad faith, it was not intended to provide a mechanism for imposing sanctions for any and all improper conduct of a party or its counsel during the litigation. See generally Oliveri v. Thompson, 803 F.2d at 1274 ("While the drafters of the rule could easily have further extended its application by referring to the entire conduct of the proceedings, they failed to do so....").
 
 
 97
 The district court did not make any findings that papers filed by the Trustees after August 1, 1983, failed to comply with the Rule. Rather, the court broadly referred to the Trustees' "strategy" and "tactics" as designed to confuse and delay the proceedings, stating that "[t]his ill-advised strategy of bad-faith delay has occurred from the beginning of this action and continued through the instant motion." To the extent that this conclusion encompassed the papers filed by the Trustees in opposition to the fee motion, we would be compelled, in light of our discussion above, to set it aside as largely erroneous. To the extent that it encompassed other papers not identified by the court, we regard it as insufficiently specific to support the imposition of sanctions pursuant to Rule 11. See generally Oliveri v. Thompson, 803 F.2d at 1275, 1281; cf. Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (2d Cir.1986) (award of attorneys' fees under bad faith exception to the "American Rule" is not sustainable absent, inter alia, a high degree of specificity in the factual findings of the district court).
 
 5. The Amount of the Reduction
 
 98
 To summarize, the fee award made by the district court should have been lower in several respects. Since the attorneys' time records are in many respects too vague to permit precise calculations, this Court estimates the appropriate reductions as follows:
 
 
 99
 (1) No fee is to be awarded for the time spent in connection with the application for fees. The amount of time in this category was, according to the district court, 14 hours with respect to Katz and 31.2 hours with respect to Baden. Baden's 31.2 hours were requested in its supplemental application; we note that additional fee-related hours were reflected, though not quantified, in the time sheets submitted with the initial application.
 
 
 100
 (2) One-third of the time of Levy and of the total remaining time of both Katz and Baden is ascribed to defense of the counterclaims.
 
 
 101
 (3) Of Baden's pre-1984 hours remaining after the exclusion of hours we have designated as counterclaim time, one-half (i.e., one-third of the total pre-1984 hours), are ascribed to Krear II and are not to be compensated in this action.
 
 
 102
 (4) Whatever hours are appropriately compensable in the present action should normally be compensated at rates no higher than those charged at the time the work was done. Since Katz could not recall precisely when he raised his hourly rate from $125 to $150 or from $150 to $175, he will not be compensated at an overall rate higher than his median, i.e., $150 per hour.
 
 
 103
 Applying these reductions and divisions to the records submitted, we conclude that the fees properly associated with Krear's own claim and the counterclaims were approximately as follows:
 
 
 104
 Krear's Own Claim
Katz $161,876
Baden 71,261
Levy 3,767
 --------
 Total: $236,904
 
 Counterclaims
 
 105
 Katz $ 80,937
Baden 41,101
Levy 1,883
 --------
 Total: $123,921
 
 
 106
 Finally, regardless of these totals, the fee to be awarded with respect to Krear's own claim may not exceed one-third of Krear's actual recovery, or $121,061. Since the $123,921 in fees associated with the counterclaim does not exceed the counterclaim's compensatory ad damnum, Krear is entitled to be reimbursed in the amount of $123,921 for those services. Thus, the total amount that the Trustees will be required to pay as a "reasonable attorney's fee" for services to Krear as prevailing party is $121,061 plus $123,921, or $244,982.
 
 
 107
 Some adjustment is required as well with respect to the court's award of $17,601 in expenses. A total of $650 of the attorneys' claimed expenditures--$400 for Katz and $250 for Baden--was incurred in connection with the fee application; the Trustees are not required to reimburse Krear or its attorneys for these expenses. Further, certain of Baden's expenses prior to 1984 must be ascribed to its handling of Krear II. Since Baden's expense records were inadequate to permit a determination of the nature or timing of the activities that required most individual expenditures, the award for expenses to Baden will be reduced by a further 25%, or $415. Hence, the award for expenses will be reduced to $15,293 for Katz and $1,243 for Baden, or a total of $16,536.
 
 
 108
 We note that the Trustees contend that Krear is not entitled to an award of attorneys' fees unless and until it has paid its attorneys. This contention has some merit since under a contract calling for "reimbursement" for attorney's fees, such as the present Contracts, a party is not entitled to an award exceeding the amount he has actually paid his attorney. See 379 Madison Avenue, Inc. v. Stuyvesant Co., 242 A.D. 567, 275 N.Y.S. 953 (1st Dep't 1934), aff'd, 268 N.Y. 576, 198 N.E. 412 (1935), overruled on other grounds, Columbia Corrugated Container Corp. v. Skyway Container Corp., 32 N.Y.2d 818, 345 N.Y.S.2d 1012, 299 N.E.2d 257 (1973). Nonetheless, the flaw of nonpayment is easily remedied, for this is not a case such as Swiss Credit Bank, 23 Misc.2d at 573, 200 N.Y.S.2d at 830, in which the requested fee was denied because the services had not yet even been rendered. Here, the services have been rendered and the Trustees will simply be required to pay Krear the fee award only after Krear has presented proof that it has paid its attorneys the sums for which reimbursement is ordered.
 
 CONCLUSION
 
 109
 We have considered all of the parties' challenges to the judgment below and, except to the extent indicated, have found them to be without merit. The judgment of the district court is affirmed insofar as it awarded Krear $363,183 and Grauso $53,104 in damages plus prejudgment interest, and is modified to provide that the Trustees are ordered to pay Krear $261,518 in attorneys' fees and expenses upon presentation by Krear of proof that it has paid at least that amount to its attorneys. As modified, the judgment is affirmed.
 
 
 110
 We note that, because Krear is plainly a "prevailing party" on the Trustees' appeal on the non-fee issues in the case, it is entitled to an award of reasonable attorneys' fees in connection with that portion of the appeal. Any application for that fee shall be made in the district court and determined by that court.
 
 
 111
 Grauso and Mozer shall recover their costs of this appeal from the Trustees. In all other respects except those specified above, the parties shall bear their own costs in connection with this appeal.