Thomas **CARNER**, Plaintiff,

v.

**MGS–576 5TH AVENUE INC**, Partenope West Coast Inc., MGS 782 Lex Inc., MGS Outlet, Inc., MGS Middle Neck, Inc., Maraolo–Short Hills, Inc., Maraolo–Cherry Creek, Inc., Maraolo–Grant Street, Inc., and Maraolo Beverly Center, Inc., Defendants and Third–Party Plaintiffs,

v.

**EMPIRE BLUE CROSS BLUE SHIELD,** Third–Party Defendant.

No. 93 Civ. 8259(CBM).

United States District Court, S.D. New York.

Aug. 18, 1997.

Robert Bach, New York City, for Plaintiff Thomas Carner.

Wincing & Wincing by Bernard Wincing, Amy Don, for Defendants and Third Party Plaintiffs MGS–576 5th Avenue, Inc., et al.

Jeffrey D. Chansler by Richard Juzumas, New York City, for Third Party Defendant Empire Blue Cross

## OPINION

MOTLEY, District Judge.

Plaintiff Thomas Carner commenced this action on December 2, 1993, alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §§ 1161 et seq., arising out of his termination from employment by the defendants. Specifically, plaintiff alleges that defendants (1) failed to notify him of his COBRA right to continued health insurance coverage under defendants' Plan at his own expense; (2) failed to provide him in a timely manner with a copy of the Plan after his request; (3) failed to notify him of his COBRA right to convert his group health coverage to an individual policy; and (4) breached their fiduciary duties under ERISA. The case was originally before Judge Cote but was transferred to the undersigned in September, 1996. Plaintiff incurred substantial medical expenses as a result of several hospitalizations and claims that all of the defendants should be responsible for the payment of these bills due to their failure to give him the required statutory notices.

All of the defendants, with the exception of MGS 782 Lex, Inc., ("MGS Lex"), moved to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the ground that they were not plaintiff's employer within the meaning of ERISA.

Judge Cote granted the motion to dismiss as to MGS 576 Fifth Avenue Inc., finding that plaintiff had failed to establish its legal existence, and denied the motion as to all the other defendants on the condition that if defendants could prove that the stores ceased to exist prior to plaintiff's termination, complaints against these defendants would also be dismissed.

Defendants assert that notice was properly given to plaintiff when he was advised orally of his continuation rights during the meeting at which plaintiff was fired. Defendants further allege that Empire Blue Cross/Blue Shield ("Blue Cross") was advised that plaintiff had left the group and that it was Blue Cross' obligation, as the Plan administrator, to provide notice to the plaintiff. Blue Cross asserts that defendants, as plaintiff's employer, were the Plan administrator and, therefore, were obligated to give the required statutory notice. Blue Cross further argues that even if it is deemed the Plan administrator with the responsibility to give notice, it was not properly or timely notified by defendants that plaintiff had left the Plan.

A bench trial was held before the court on January 15 and 16, 1997. Based on the stipulations of facts between the parties, the trial testimony and exhibits, the court makes the following Findings of Facts and Conclusions of Law in favor of plaintiff.

## FINDINGS OF FACTS

### I. THE PARTIES

1. Plaintiff Thomas Carner currently resides in Albuquerque, New Mexico. He was an employee of some of the defendants from 1978 to 1984 and from 1986 to 1992. (Trial Transcript at 31–33, 54) ("Tr. at . . .").

2. Defendant MGS Lex is a New York Corporation with its offices at 576 Fifth Avenue, New York, N.Y. ("Fifth Avenue office"). It does business in this district selling imported shoes and other apparel at various locations in New York City. (Tr. at 26). In 1991–1992, MGS Lex had approximately 20 or more full time employees. (Tr. at 26). 100% of MGS Lex stock is owned by Harnafin S.A., a foreign corporation. (Tr. at 26).

3. Defendant MGS 551 Madison Avenue, Inc., ("MGS 551") is a New York Corporation and is a leasehold company with no assets or employees. (Tr. at 125). MGS 551 is wholly owned by MGS Lex. (Tr. at 26).

4. Defendant Partenope West Coast, Inc., ("Partenope") is a California corporation that sells shoes in California and of its 10,000 shares, 9,000 are owned by GAP SPA, a foreign corporation, and 1,000 are owned by Massimo Ruggiero, ("Ruggiero"), an officer of the defendants. (Tr. at 26).

5. Defendant Maraolo Cherry Creek, Inc., ("Cherry Creek"), is a Colorado corporation that sells shoes in Colorado and of its 100 shares, 90 are owned by GAP SPA and 10 are owned by Ruggiero. (Tr. at 27).

6. Defendant Maraolo Beverly Center, Inc., ("Beverly Center"), is a California corporation that sells shoes in California and of its 100 shares, 90 are owned by GAP SPA and 10 are owned by Ruggiero. (Tr. at 27).

7. Defendant Maraolo Factory Outlet, Inc., ("Factory Outlet"), is a Florida corporation that sells shoes in Florida and of its 100 shares, 90 are owned by GAP SPA and 10 are owned by Ruggiero. (Tr. at 27–28).

8. Defendant Maraolo Short Hills, Inc., ("Short Hills"), is a New Jersey corporation that sells shoes in New Jersey and of its 100 shares, 80 are owned by GAP SPA and 20 are owned by MGS Lex. (Tr. at 28).

9. MGS Middle Neck, ("Middle Neck"), is a New York corporation that sells shoes in New York and of its 100 shares, 80 are owned by GAP SPA and 20 are owned by MGS Lex. (Tr. at 28).

10. Defendant Maraolo Grant Street, ("Grant Street"), is a Pennsylvania corporation that sells shoes in Pennsylvania and of its 100 shares, 80 are owned by GAP SPA and 20 are owned by MGS Lex. (Tr. at 29).

11. Defendants Partenope, Cherry Creek, Beverly Center, Factory Outlet, Short Hills, Middle Neck, and Grant Street maintained their books and records at the Fifth Avenue office and filed their federal corporate tax returns using the Fifth Avenue office address. (Tr. at 26, 27, 28).

12. Alex Aingorn ("Aingorn") is the president and Ruggiero is the vice-president of the following companies; MGS Lex, Short Hills, MGS 551, and Middle Neck. (Tr. at 29).

13. Ruggiero is the president and Aingorn is the vice-president of the following companies; Partenope, Cherry Creek, Grant Street, Beverly Center, and Factory Outlet. (Tr. at 29).

14. The following corporations are no longer in existence: Middle Neck merged into MGS Lex at the end of fiscal year March 31, 1993; and Cherry Creek and Grant Street closed during tax year ending March 31, 1992. (Tr. at 28, 124–125).

15. Third Party Defendant Blue Cross is a not-for-profit health services corporation organized and existing under Article 43 of the New York State Insurance Law with its principal place of business at 622 Third Avenue, New York, New York. (Tr. at 29).

## II. THE DISPUTE

16. Carner was an employee of some of the defendant shoe stores in various states from 1978 through 1984 and from 1986 through 1992. (Tr. at 31–33, 54). From 1984 to 1986, plaintiff did not work for any company which sold shoes under the Maraolo name. (Tr. at 52). Carner never managed nor worked for the Middle Neck, Grant Street or MGS 551 companies. (Tr. at 126).

17. In 1986, plaintiff was re-employed by Partenope and was sent to San Francisco, California to supervise construction, develop the market on the west coast, and manage the new San Francisco, Maraolo store. (Tr. at 31–32).

18. Four years later, in 1990, Carner was transferred to Denver, Colorado to work as manager for the new store Maraolo of Cherry Creek. (Tr. at 32–33, 34). In April or May, 1991, Carner was transferred to New Jersey to temporarily manage the Maraolo Short Hills store. (Tr. at 33).

19. Personnel policies were set by Ruggiero, the officer responsible for the day to day operation of the stores (Tr. at 34) and Aingorn, chief financial officer of the stores. (Tr. at 36). Managers were responsible for implementing policies, i.e. informing employ-ees of company policy, procedures and benefits, severance pay and/or vacation pay. (Tr. at 63, 128–129).

20. As manager of various stores, plaintiff would discuss with Ruggiero, the hiring or firing of an employee, hours of employment, wages, and insurance benefits. (Tr. at 35–36). Plaintiff would discuss these matters with newly hired employees and would advise terminated employees as to whether they would receive vacation pay, severance pay or benefits. (Tr. at 63–64). Additionally, as manager, plaintiff would submit daily ledger reports, listings of inventory that were sold, bank deposit receipts, and time cards to the Fifth Avenue office. (Tr. at 37, 128).

21. The Fifth Avenue office sent checks to employees at the various Maraolo stores when they were due and also sent materials such as ledger books, transfer books, and all memorandums. (Tr. at 37). Sometimes the Fifth Avenue office would send merchandise directly to customers if the particular Maraolo store did not carry it. (Tr. at 38). In June or July 1991, plaintiff was transferred to New York to work for MGS Lex at the Fifth Avenue office as merchandise coordinator. (Tr. at 24, 33–34).

22. As merchandise coordinator, Carner supervised all the merchandise that came in from overseas and prepared and shipped them to the stores from the warehouse. (Tr. at 38). Carner also coordinated the merchandising and inventory of the five or six Maraolo stores in New York and filled in for managers where needed, assuming full responsibility of the management of that store, including servicing the employees of that store. (Tr. at 65, 127). He visited stores and observed their appearances and the appearances of sales people and of managers. (Tr. at 127).

23. While Carner was an employee of defendants, he was a participant in defendants' group medical plan ("Plan") with Blue Cross. (Tr. at 24, 40, 52–53). Defendants purchased health insurance from Blue Cross for their employees and employees did not contribute to the Plan because MGS Lex paid the entire premiums for insurance. (Tr. at 29). Irrespective of which store plaintiff worked at, be

it Partenope, Cherry Creek, or MGS Lex, he remained a member of the same Plan. (Tr. at 41).

24. Although MGS Lex paid the premiums on behalf of all of the defendant companies, Aingorn wrote the premium check to Blue Cross from MGS Lex and would then break the bill down in order to allocate the expense to the various companies proportionate to that company's portion of the total bill. The companies would then reimburse MGS Lex for their share. (Tr. at 143; Plaintiffs Ex. 10).

25. In 1991 while plaintiff was still working for one of the Maraolo stores, plaintiff was diagnosed with diverticulitis, an inflammation of the large intestines. (Tr. at 80, 217). As a participant in defendants' Plan, Carner filed claims with Blue Cross and received reimbursements. (Tr. at 54, 81).

26. Defendants contend that in or about mid-February 1992, Ruggiero, Carner's superior at MGS Lex, met with Aingorn and voiced his desire to dismiss Carner or to offer him a different position in the company due to Carner's poor job performance. (Tr. at 130). In the event that Carner was terminated, Ruggiero and Aingorn agreed that Carner would be given six weeks of severance pay, three weeks of vacation time, and coverage of his health insurance until the end of May. (Tr. at 30).

27. The parties stipulated that Carner was terminated in 1992. (Tr. at 30). However, the parties disagreed on the month and date when plaintiff was actually terminated. After his termination, plaintiff was given severance pay, accrued vacation pay and received reimbursement for moving expenses. (Tr. at 76). There was also a dispute over whether plaintiff received all of the severance pay he was promised. (Tr. at 44–45, 76, 133–134). Carner was promised and received coverage under the Plan until May 31, 1992. (Tr. at 30).

28. The parties agree that the meeting where Carner was terminated was held at defendants' Fifth Avenue office and that Ain-

gorn, Ruggiero, and Esther Gabrielides ("Gabrielides"), an employee of defendant MGS Lex, were present at the meeting. (Tr. at 41, 72, 131).

29. Parties also agree that Carner was told that the company was not happy with his job performance and that he was being fired. (Tr. at 42). There was testimony that prior thereto Carner was seriously considering resigning (Tr. at 42–43, 74) had given notice to his landlord and was planning to move to California at the end of March, 1992. (Tr. at 73). Carner testified that he was reimbursed for his moving expenses to California by defendants' payment of the bill. (Tr. at 46).

30. As noted above, plaintiff and defendants disagree as to exactly when Carner's discharge occurred. They also disagree as to what was said at the discharge meeting. Plaintiff claims that he was discharged on March 3, 1992. (Tr. at 41). Defendants claim that the discharge meeting occurred in mid-February but do not specify a date. (Tr. at 131,155, 176).

31. Defendants claim that at the meeting, Carner was advised by Aingorn of his right to continue to participate in the Plan for 18 months provided that he pay the monthly premium of $252.30 to the company. (Tr. at 133, 156, 176–177). Defendants' witnesses also testified that when plaintiff was orally advised of his right to continue coverage, Carner declined to participate in the Plan and said that he did not want anything from the company because his wife's family would take care of him. (Tr. at 157). Carner, however, testified that he was not told that he could continue to participate in the Plan at the meeting. (Tr. at 44).

32. Ruggiero testified that he spoke to Carner on February 20, 1992, several days after the discharge, wished him well and again reminded him that he could continue to participate in the Plan. Ruggiero testified that he wrote him a note that day to confirm the discussion which was typed, dated and mailed by Gabrielides to Carner's last known address in New Jersey.[1] (Tr. at 158, 180–181).

---

1. (Defendants' Ex. B).

*February 20, 1992*

Dear Tom,

I am sorry that we are no longer working together after 11 years. I am sure going to feel

Defendants contend that they never received a response to the letter from Carner. (Tr. at 160). Defendants testified that the records and files maintained in the corporate offices of MGS Lex reveal that Carner neither wrote the company regarding continuation of his health insurance nor sent any money for payment. (Tr. at 134, 160).

33. As a result, Aingorn testified that he crossed Carner's name off the premium statement for the Blue Cross bill dated May 12, 1992, which covered the premium for the period June 1, 1992 to July 1, 1992. On the back of the premium statement, next to Carner's crossed off name, were the words, written by Aingorn, "Left Group" under the column "Explanation or Changes." (Joint Ex. 9). Carner's premium in the amount of $252.31 for the month of June was deducted from the total cost and the adjusted amount of $756.93 was paid to Blue Cross. The names and social security numbers of two other employees who left the group at the same time were taken off the Plan in the same manner as Carner's. The reason for their deletion from the policy was given and a deduction of their share of premiums listed on the back of the premium statement with Carner's. Aingorn testified that this was MGS Lex's regular policy with Blue Cross each time an employee left the company. (Tr. at 138–141).

34. Blue Cross acknowledged in a letter, dated November 10, 1993, and through Siemone O'Brien, its witness at trial, that Blue Cross records indicated that Carner was terminated from the Plan on June 1, 1992. (Joint Ex. 12, Infra n. 6; Tr. at 112–15).

35. In regards to the letter from Ruggiero, dated February 20, 1996, Carner testified that he never received the letter and that he never received any other written (or oral) communication about the Plan or his right to continuation coverage. (Tr. at 44).

36. Based on all the evidence, the court finds that the validity of the February 20, 1992 letter is questionable as well as defendants' claim that plaintiff was fired on an

unspecified date in mid-February. For the following reasons, the court finds that Carner was discharged on March 3, 1992 as he claimed.

A. Carner testified that he and his wife moved about one week after he was discharged. (Tr. at 76). Defendants did not dispute this fact. Actually, defendants' counsel conceded that plaintiff moved one week after his discharge in both her opening statement and cross-examination of Carner. (Tr. at 11, 77).

B. After his termination, Carner called the company, spoke with Gabrielides, and again informed her that he was moving to California. (Tr. at 177). Gabrielides testified that Carner made this call within a week of his discharge and that she then handed the phone to Ruggiero who allegedly reminded Carner of his right to continuation coverage. (Tr. at 181). Carner, however, testified that the sole topic of the phone conversation with Ruggiero was the arrangements for the payment of the moving expenses. (Tr. at 188). Carner explained that Ruggiero told him to have the moving company bill defendants directly and testified that at no point in the conversation did Ruggiero mention plaintiff's right to continuation coverage. (Tr. at 188).

C. The invoice from Berkins Moving Company, dated April 13, 1992, (Joint Ex. 10), indicates that Carner's moving date was March 10, 1992 which corroborates Carner's claim that he was fired on March 3, 1992 (Tr. at 187), precisely a week before his moving date. The invoice was billed directly to MGS Lex and had Aingorn's name listed in the address, in accordance with the agreement that Carner testified was made between himself and Ruggiero.

D. Carner called defendants when he got to California to let them know where to forward his checks (Tr. at 178,189) and called again in April, 1992 to tell them he was moving to Albuquerque, New Mexico

your absence, but life does send people in different directions.
I do wish you the best of luck and if you need any help from me or our company including

remaining with our group health insurance please let me know.

and to have his checks forwarded there. Carner testified that he never asked anyone when he called the office about continuing his medical coverage with the defendants' group Plan. (Tr. at 78).

E. Defendants contend that they do not know, nor have a record of, the exact date of Carner's termination or the discharge meeting but contend that the meeting was sometime in mid-February.[2] Employers in New York are obligated to notify a terminated employee in writing of the exact date of his termination as well as the cancellation of employee benefits in connection with the employee's termination. The court finds that, in this case, given the demands of New York labor law,[3] it is not credible that defendants do not have any written record of the exact date of Carner's termination or that none of the witnesses present at the discharge meeting can recall the date of the meeting and termination of Carner.

37. Furthermore, the court finds that plaintiff was not notified of his additional right to continuation coverage under the defendants' Plan at the March 3, 1992 discharge meeting.

38. In 1993, plaintiff, through his attorney, Robert Bach ("Bach"), requested defendants to supply Carner with COBRA election forms (Tr. at 50–51) by certified letter,[4] return receipt requested, dated April 27, 1993. Defendants acknowledged receipt of the letter on April 29, 1993. (Plaintiffs Ex. 1).

39. On June 25, 1993 and July 28, 1993, Bach again requested by letter that defendants supply Carner with COBRA election forms. (Plaintiffs Ex. 2 and 3). The July 28, 1993 letter was certified, return receipt requested and defendants acknowledged receipt of the July 28th letter. (Plaintiff's Ex. 3). There was no testimony that defendants did not receive the June 25, 1993 letter or that they responded to it.

40. On August 5, 1993, defendants' attorney, Bernard Wincing ("Wincing"), sent Bach a form which was described as a "COBRA application." (Joint Ex. 6). On August 16, 1993, Bach sent Carner's executed "COBRA application" form to Wincing, return receipt requested. (Plaintiffs Ex. 4). Wincing acknowledged receipt on August 17, 1993. (Plaintiffs Ex. 4). On August 26, 1993, Bach sent a letter to Wincing requesting to be advised of the status of Carner's application and for a notice of rates for the continuation coverage. (Plaintiffs Ex. 5).

41. On September 3, 1993, defendants sent Carner a new "COBRA application" and claimed in the cover letter that "in error the wrong application was sent to [Carner]." (Joint Ex. 7). Plaintiff alleges that the previous form appeared to be a benefit claim form with the term COBRA Application typed on it. (see, Plaintiffs Proposed Findings of Facts and Conclusions of Law, 16).

42. On September 21, 1993, by certified mail, return receipt requested, Bach sent to Wincing the new "COBRA form" which had been signed and executed by Carner. In the cover letter, Bach noted that the form was an application to join a community group rather than an application for continuation coverage and informed Wincing that Carner filled the form out nonetheless and struck out the inapplicable sections. (Plaintiffs Ex. 7).

43. On October 26, 1993, defendants wrote to Blue Cross requesting the reinstatement

---

**2.** Linda Weber, an employee of the defendants who did mostly office work, i.e. writing letters and answering the phones, (Tr. at 183), sent a letter to Blue Cross on behalf of Maraolo stating however that Carner was dismissed at the end of February. (Joint Ex. 11, Infra n. 5).

**3.** The statute reads in part: "Every employer shall: ... notify any employee terminated from employment, in writing, of the exact date of such termination as well as the exact date of cancellation of employee benefits connected with such termination. In no case shall notice of such termination be provided more than five working days after the date of such termination." 31

N.Y. Labor § 195(6) (McKinney's Labor Law 1986).

**4.** The letter from Bach reads in relevant part:

"Mr. Carner was an employee of the above named company and when he terminated employment last year *he was not advised* of his rights under COBRA. The *failure to give the appropriate notice is both a violation of federal and state law.*

Kindly forward the appropriate COBRA election forms to me so I may forward them to Mr. Carner. I would also appreciate a copy of the group policy." (emphasis added).

of Carner to defendants' group coverage. (Joint Ex. 11).[5]

44. By letter dated November 30, 1993, Blue Cross wrote to defendants at the Fifth Avenue office and informed defendants that it was too late to obtain COBRA coverage for Carner. (Joint Ex. 12).[6]

45. The court finds that defendants' conduct, following plaintiff's termination, is completely inconsistent with their position that they gave plaintiff notice of his COBRA right to continuation coverage under defendants' Plan at the discharge meeting. Had the defendants advised Carner of his COBRA coverage at the discharge meeting as they claim, the logical response to plaintiff's requests for COBRA coverage and election forms should have been that Carner was given the required COBRA notice when he was discharged, was told on at least two occasions (as defendants also claim) that he should let the defendants know about coverage as soon as possible, and that his time to elect had expired. The first letter sent to defendants in regards to Carner's COBRA rights was sent by his attorney who quite clearly accused defendants of failing to give Carner notice upon his termination and noted that they were potentially in violation of federal and state law. Defendants initially failed to respond to the various letters threatening court action. When defendants eventually did respond, they sent Carner mistaken COBRA forms and advised him to fill them out and return them to their office. Upon plaintiff's execution of the forms, defendants went on to then write Blue Cross requesting the reinstatement of Carner.

Again, no where in the letter to Blue Cross did defendants state that they advised Carner of his COBRA rights; they simply pointed out that they continued to pay Carner's (and his families) insurance premiums for three months after he was terminated,[7] which was a gratuitous payment and not an obligation on the part of defendants. (Tr. at 100). Based on the above established facts and the inconsistent behavior of defendants, the court finds that defendants did not give Carner notice of his COBRA rights at the March 3rd discharge meeting.

46. The court also finds that plaintiff requested a copy of the Plan in a letter dated April 27, 1993, (Plaintiffs Ex. 1, Supra n. 4). The April 27th letter was sent certified, return receipt requested and defendants acknowledged receipt of the letter by signing and dating the receipt on April 29, 1993. Defendants did not submit any evidence as to if and when they responded to plaintiff's April 27th request. Since no evidence was submitted on this issue, the court finds that a copy of the Plan was not given to Carner until June 22, 1994, as alleged in the Complaint. (see, Second Amended Complaint, ¶ 49; Tr. at 61–62, 108).

47. Approximately nine (9) months after Carner was fired, he was hospitalized for diverticulitis at the Presbyterian Hospital in Albuquerque, New Mexico from December 18, 1992 to January 9, 1993. ˙ (Tr. at 91–92). The expense of Carner's initial hospitalization was approximately $53, 000.000. (Tr. at 97).

---

**5.** The letter reads in relevant part:
"Enclosed please find a completed COBRA application from a former employee, Mr. Thomas Carner.
Mr. Carner's attorney has contacted us in regard to his Medical coverage.
Mr. Carner was dismissed the *end of February*, 1992. We contined [sic] to pay his medical insurance until the end of May 1992. We paid in full for not only Mr. Carner, but Mrs. Carner, and their child. They know [sic] claim we owe them COBRA.
Please reinstate above." (emphasis added).

**6.** The letter reads in relevant part:
"This is in response to your recent inquiry regarding Thomas Carner. In order for a terminated employee to enroll for COBRA cover-

age they would have to apply within 60 days from the date your company terminates their insurance coverage. Our records indicate that Mr. Carner was terminated from your group on June 1, 1992 therefore an application for COBRA would have to have been received by us no later than 8–1–92.
According to our underwriting guidelines, Mr. Carner is ineligible for COBRA coverage at this time, since more than 60 days have elapsed."

**7.** Although in this letter it is claimed that defendants paid in full for Carner, his wife and child, at trial defendants' counsel, in cross-examining Carner, noted that Carner's wife and child were in fact not on defendants' Plan. (Tr. at 81).

48. Shortly after his release from the hospital, in either late February or early March, 1993, Carner testified that he found out for the first time that he may be entitled to COBRA benefits. (Tr. at 47, 95). Plaintiff testified that his wife was talking to a friend about Carner's hospitalization and the friend informed her that Carner was entitled to COBRA from his previous employer. (Tr. at 49). A couple of weeks after his wife informed him of the conversation with her friend, Carner contacted his attorney. (Tr. at 97).

49. Carner was hospitalized again in Presbyterian from May 15, 1993 to May 25, 1993; from July 14, 1993 to September 13, 1993; from January 20, 1994 to April 29, 1994. (Tr. at 92–93).

50. During Carner's hospitalizations, he testified that he was unemployed (Tr. at 78, 93) and without health insurance (Tr. at 92) and did not apply for government benefits or state aid from New York or New Mexico. (Tr. at 79). Carner did, however, submit a COBRA application to defendants, dated September 8, 1993 (Third Party Defendant's Ex. BB; Tr. at 104–105) that was sent to him by defendants, pursuant to his attorney's numerous requests. (Tr. at 50–51).

51. In January, 1993, plaintiff's wife attempted to put Carner on her insurance policy with American Medical Security Insurance Company. (Tr. at 82). His application was rejected on February 17, 1994. (Tr. at 84; Defendants' Ex. D).

52. Toward the end of his last stay in the hospital, plaintiff testified that he found out about CHIPS Blue Cross Blue Shield, a high risk insurance policy, from an advisor who worked in the hospital. (Tr. at 89–90, 94). Carner applied for and obtained an individual insurance policy with CHIPS and paid the premiums himself. (Tr. at 107).

53. Carner owes Presbyterian approximately $600, 000.000 for his various hospital stays (Tr. at 97) and asserts that all defendants are proper parties in the present action for relief.

Defendants claim that only defendant MGS Lex is a proper party since it, and not the others, was Carner's employer at the time of his discharge.

54. Plaintiff maintains that the other named defendants, with the exception of 576 Fifth Avenue,[8] should be held responsible for failing to provide him with the required COBRA notice and has presented four theories for holding the defendants liable: (1) MGS Lex and Partenope were his "employer"; (2) MGS Lex, Partenope, and Factory Outlet were "Plan sponsors"; (3) all defendants are members of two common controlled groups; and (4) all defendants are a single economic enterprise and, therefore, a single employer within the meaning of ERISA and COBRA. The court will discuss plaintiff's first and fourth theories of liability here, in it's Findings of Facts, since they both involve factual determinations. Plaintiffs second and third theories will be discussed below in the court's Conclusions of Law.

55. In regard to plaintiff's first argument, Carner testified that at the time of his discharge he was an employee of both MGS Lex and Partenope. (Tr. at 39). It was stipulated by the parties that Carner received W-2 income from Partenope in 1991 and in 1992. At trial, plaintiff submitted into evidence pay stubs from both MGS Lex and Partenope. (Plaintiffs Ex. 9; Tr. at 40). After being transferred to New York, plaintiff testified that he remained on the payroll of Partenope and received wages from the company for work he continued to do for it. (Tr. at 39–40). In support of its previous motion to dismiss, defendants asserted that the payments made to Carner from Partenope were for commissions Carner had previously earned.[9] However, at trial, defendants submitted no evidence or testimony that Carner was not an employee of Partenope or that the checks to Carner were for commissions previously earned. Therefore, the court finds that plaintiff was an employee of both

---

**8.** 576 Fifth Avenue was dismissed from the case by Judge Cote on the Defendants' Motion to Dismiss. *Carner v. MGS,* 1996 WL 445366, 1996 U.S. Dist. Lexis 11196, Slip Opinion p. 15 (August 6, 1996).

**9.** *Id.*

MGS and Partenope at the time of his discharge.

56. For plaintiff's fourth argument, plaintiff cites *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235 (2d Cir.1995), to show that the Second Circuit has adopted a four part test to determine if related companies can be found to be a single integrated enterprise, i.e., a single employer. The determination of single employer status is a question of fact. *see, Lihli Fashions Corp., Inc. v. N.L.R.B.,* 80 F.3d 743, 747 (2d Cir.1996). Plaintiff argues that, given the facts in this particular case, the four part test of "(1) interrelation of operation; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control," *Id.* at 1240 (citing *Garcia v. Elf Atochem North America,* 28 F.3d 446, 450 (5th Cir.1994)), is satisfied, thereby making all the defendants the single employer of Carner.

57. The court finds that the single employer doctrine is not applicable here, hence, the court will not make a factual determination as to the four part test as to all other defendants.

■ 58. The single employer doctrine is an exception to the doctrine of limited liability in corporate law, which allows corporate entities to escape liability for the acts of a separate, related entity, except under extraordinary circumstances, commonly referred to as piercing the corporate veil. *Murray v. Miner,* 74 F.3d 402, 404 (2d Cir.1996). Similarly, only under extraordinary circumstances are employees of one entity treated as employees of a related entity. *Id.* (citing *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir.1993)). For example, the National Labor Relations Board ("NLRB") originally developed the single employer doctrine and the four part test as a means of determining whether two entities constituted a single employer in order to protect the collective bargaining rights of employees and to advance industrial stability. *Miner,* 74 F.3d at 404 n. 1. The single employer criteria were subsequently approved by the Supreme Court in *Radio and*

*Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) and have been applied on numerous occasions in matters arising out of labor disputes. *see, Parklane Hosiery Co., Inc.,* 203 NLRB 597, 612 (1973); *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1121 (3d Cir.1982); *NLRB v. Al Bryant, Inc.,* 711 F.2d 543, 551 (3d Cir.1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); *Goodman Piping Products, Inc. v. NLRB,* 741 F.2d 10, 11 (2d Cir.1984); *Lihli Fashions Corp., Inc., v. NLRB,* 80 F.3d 743, 747 (2d Cir.1996).

59. However, many circuits have now applied the single employer doctrine to the civil rights context. *Baker v. Stuart Broadcasting Co.,* 560 F.2d 389, 392 (8th Cir.1977); *Trevino v. Celanese Corp.,* 701 F.2d 397, 403–404 (5th Cir.1983); *York v. Tennessee Crushed Stone Ass'n,* 684 F.2d 360, 362 (6th Cir.1982) (applying single employer doctrine under the ADEA); *Armbruster v. Quinn,* 711 F.2d 1332, 1336 (6th Cir.1983) (single employer doctrine applied to Title VII because of similar, wide, and general definition of "employer" as in NLRA).

■ 60. In this case, the decision which plaintiff relies on, to establish that the other defendants are a single employer within the meaning of ERISA and COBRA, is a case in which the Second Circuit, following precedent of other circuits, applied the single employer doctrine to Title VII, not COBRA. *Cook,* 69 F.3d at 1235 ("We believe that the appropriate test *under Title VII* for determining when parent companies may be considered employers of a subsidiary's employees is the four-part test adopted by the Fifth, Sixth, and Eight Circuits") (emphasis added). ERISA and COBRA are not mentioned; therefore, this court declines to extend the single employer doctrine to these statutes particularly given the limited definition of employer under ERISA and COBRA as compared to the broader definitions found under NLRA and Title VII.[10] *see,* 711 F.2d at 1336.

10. ERISA defines employer as "any person acting directly as an employer, or indirectly in the interest of an employer, *in relation to an employee benefit plan;* and includes a group or associa-

tion of employers acting for an employer in such capacity". 29 U.S.C. § 1002(5) (emphasis added). COBRA amendments to ERISA further add to the definition of employer by reference to the

Therefore, all of the defendants in this case cannot be deemed proper defendants under the single employer doctrine because it is inapplicable.

## CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over plaintiff's COBRA claim pursuant to 29 U.S.C. § 1132(e)(1) and (f).

2. The Southern District of New York is the proper venue for this action. 29 U.S.C. § 1132(e)(2).

3. This court has jurisdiction over defendant MGS LEX because it has an office and does business in the Southern District of New York and because the Plan is administered in the Southern District of New York.

4. This court has jurisdiction over defendant Partenope and the other named defendants because they all have sufficient contacts with the Southern District of New York. It was stipulated that they all do business out of the Fifth Avenue office, i.e. maintaining books and records, filing of tax returns for each company using the New York office, and paying employees.

5. Defendants maintained a health insurance Plan within the meaning of 29 U.S.C. § 1167(1) and plaintiff, as a beneficiary under defendants' Plan, is entitled to bring this civil action for the relief provided for in 29 U.S.C. § 1132(a)(1).

6. COBRA, 29 U.S.C. §§ 1161–1168, a relatively short statute, amends ERISA and requires employers who provide health insurance plans to continue to provide coverage to employees who leave work under certain circumstances. 29 U.S.C. § 1161(a) states:

> The plan sponsor of each group health plan shall provide, in accordance with this part [29 U.S.C. §§ 1161 et seq.], that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

7. In this case, parties do not dispute that plaintiff is a "qualified beneficiary"[11] and that his termination is a "qualifying event"[12] within the meaning of COBRA.

8. Plaintiff argues, as his second theory of liability[13] that MGS Lex, Partenope, and

definitions contained in the Tax Code. 29 U.S.C. § 1167(4). Most published opinions addressing the term "employer" under COBRA have to do with an employer's attempt to be exempted from the COBRA requirements under the "small employer" exemption in § 1161(b). The general definition of "employer" found in ERISA seems also to apply to claims arising specifically under COBRA. *see, Local 217 v. MHM, Inc.,* 805 F.Supp. 93, 113–114 (D.Conn.1991) (defendant considered an "employer" under COBRA because it acted "indirectly in the interest of [the] employer, in relation to an employee benefit plan"), *aff'd,* 976 F.2d 805, 808 (2d Cir.1992).

Even if defendants' argued, which they do not, that the single employer doctrine is applicable because the definition of employer in ERISA is not applicable to COBRA-based claims and because the definition of employer under COBRA is unclear and ambiguous, the Supreme Court has noted that when a statute does not helpfully define a term, court's should not apply a definition that is broader than its common law definition. *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 322, 112 S.Ct. 1344, 1347–48, 117 L.Ed.2d 581 (1992) (adopting common law test for determining who is an "employee" under ERISA). The Second Circuit has itself noted that it is unclear whether the single employer doctrine applies to common law claims of employees. *Miner,* 74 F.3d at 404 n. 2.

Moreover, the COBRA amendments seems to take into consideration the single employer issue by incorporating the control group provisions of the tax code to define "employer." These provisions are cited below in the court's discussion of plaintiff's third theory of liability.

11. 29 U.S.C. § 1167 provides in relevant part:

> the term "qualified beneficiary" means, with respect to a covered employee under a group health plan, any other individual who, on the day before the qualifying event for that employee, is a beneficiary under the plan. § 1167(3)(A).

12. 29 U.S.C. § 1163 provides in relevant part:

> the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part [29 U.S.C. §§ 1161 et seq.], would result in the loss of coverage of a qualified beneficiary: ... (2) the termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment. § 1163(2).

13. Judge Cote addressed this theory and plaintiff's third theory in defendants' motion to dismiss, therefore, the court will discuss them brief-

Factory Outlet should be liable, as Plan sponsors, for failing to notify him of his entitlement to continuation coverage, as a result of his termination.

9. Upon the occurrence of a qualifying event, COBRA's provisions for notification state that *"the administrator* shall notify—in the case of a qualifying event described in paragraph ... (2) [termination of an employee], any qualified beneficiary, of such beneficiary's rights under this [part]." 29 U.S.C. § 1166(a)(4) (emphasis added).

10. The term "administrator" is defined in relevant part as: "(I) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the *plan sponsor.*" 29 U.S.C. § 1002(16)(A) (emphasis added).

11. The term "plan sponsor" is defined in relevant part as: "(I) the *employer* in the case of an employee benefit plan established or maintained by a single employer," 29 U.S.C. § 1002(16)(B)(I) (emphasis added), and employer is defined as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. § 1002(5).

12. Plaintiff contends that MGS Lex, Partenope and Factory Outlet are the Plan sponsor because they are employers, within the meaning of the statute, by virtue of their contribution to the health insurance Plan, i.e., acting directly as employers or indirectly as employers in relations to a employee benefit plan; and as a Plan sponsor was also the Plan administrator due to the fact that the Plan failed to designate a Plan administrator. 29 U.S.C. § 1002(16)(A)(ii). Since there is no dispute as to whether MGS Lex is an employer and since the court has already determined in its Findings of Facts that Partenope was also plaintiff's employer, the court need only address plaintiffs contention with regard to Factory Outlet's status.

13. Plaintiff's argument that Factory Outlet's contribution to the Plan made it Carner's employer, hence, a Plan sponsor is to no avail. As Judge Cote noted in her opinion, the "plan sponsor" is the "employer"

so the issue turns on whether Factory Outlet was plaintiff's employer at the time the qualifying event took place. Plaintiff has produced no evidence nor testimony that he was an employee of Factory Outlet. Although Factory Outlet contributed to the Plan by paying its share of the premium for its employees, that is evidence of the fact that Factory Outlet was an employer "in relation to an employee benefit plan" with respect to certain employees. It cannot serve as a basis for showing that plaintiff, himself, was one of Factory Outlet's employees. Plan benefits were tied to employment with a particular defendant corporation. MGS Lex paid the premiums on behalf of all the companies but the individual companies reimbursed MGS Lex for the cost of their particular employees' coverage under the Plan. Since plaintiff submitted no other evidence showing that Factory Outlet was his employer, the court finds that Factory Outlets is not a proper defendant in this action.

14. For his last argument, plaintiff contends that all defendants are liable as an "employer" as that term is defined in the COBRA amendments to ERISA. Specifically, plaintiff argues that the defendants are liable under the "parent-subsidiary" theory under the "controlled group" section of COBRA.

15. In this case, plaintiff contends that there are two control groups, one which includes defendants MGS Lex and MGS 551 and the other which includes defendants Partenope, Beverly Center, Factory Outlet, Short Hills, Cherry Creek, Middle Neck, and Grant Street and argues that defendants, as members of the control groups, are his "employer" within the meaning of COBRA. At trial, defendants argued that the individual companies do not comprise common control groups, hence, cannot be considered Carner's employer, since each company had different tax returns, tax identification numbers, corporate checking accounts, separate banks and separate corporate resolutions and minutes.

16. As was stipulated by the parties and noted in the Findings of Facts, the stock

ly as this court's findings are consistent with Judge Cote's ruling.

ownership of defendant companies is as follows:

## COMMON CONTROL GROUP A

| Company | No. of Shares | Owner of Shares (Percentage of Ownership) |
|---|---|---|
| MGS Lex | 100 | Harnafin (100%) |
| MGS 551 | 100 | MGS Lex (100%) |

## COMMON CONTROL GROUP B

| Company | No. of Shares | Owner of Shares |
|---|---|---|
| Partenope | 9000 | GAP SPA (90%) |
| | 1000 | Ruggiero (10%) |
| Cherry Creek | 90 | GAP SPA (90%) |
| | 10 | Ruggiero (10%) |
| Beverly Center | 90 | GAP SPA (90%) |
| | 10 | Ruggiero (10%) |
| Factory Outlet | 90 | GAP SPA (90%) |
| | 10 | Ruggiero (10%) |
| Short Hills | 80 | GAP SPA (80%) |
| | 20 | MGS Lex (20%) |
| Middle Neck, Inc. | 80 | GAP SPA (80%) |
| | 20 | MGS Lex (20%) |
| Grant Street | 80 | GAP SPA (80%) |
| | 20 | MGS Lex (20%) |

17. In defining an "employer", the COBRA amendment refers to the Tax Code and reads as follows:

> subsection (t) (relating to application of controlled group rules to certain employee benefits) of *section 414 of Title 26* shall apply for purposes of this part in the same manner and to the same extent as such subsections apply for purposes of section 106 of such title.

29 U.S.C. § 1167(4) (emphasis added).[14]

18. The Tax Code in turn provides that "all employees who are treated as employed by a single employer under subsection (b), (c), or (m) shall be treated as employed by a single employer for purposes of an applicable section."[15] 26 U.S.C. 414(t) (emphasis added).

19. Subsection 414(b) provides in relevant part that; "all employees of all corporations which are members of a *controlled group of corporations* (within the meaning of *section 1563(a) . . .* ) shall be treated as employed by a single employer." 26 U.S.C. 414(b) (emphasis added).

20. Section 1563(a) defines "parent-subsidiary," one of the two types of controlled groups provided in this section, as follows:

> (1) Parent-subsidiary controlled group.—— one or more chains of corporations connected through stock ownership with a common parent corporation if——
>
> (a) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned . . . by one or more of the other corporations; and

---

14. 26 U.S.C. § 106 has to do with the gross income of an employee which does not include employer provided coverage under an accident or health plan.

15. 26 U.S.C. § 106 is an applicable section. 26 U.S.C. § 414(t)(2).

(B) the common parent corporation owns ... stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations.

26 U.S.C. § 1563(a)(1).

21. In applying the common control group definitions to examples, Treasury Department regulations shed light on their meaning.[16] Examples 1 and 2 of 26 C.F.R. § 1.1563–1(a)(2)(ii) are dispositive on the issue now before the court and they read as follows:

P Corporation owns stock possessing 80 percent of the total combined voting power of all classes of stock entitled to vote of § Corporation ... S owns stock possessing 80 percent of the total value of shares of all classes of stock of T Corporation. P is the common parent of a parent-subsidiary controlled group consisting of member corporation P, S, and T. *The result would be the same if P, rather than S, owned the T stock.*

(emphasis added).

■ 22. In this case, it is clear that the issue of whether defendants make up two control groups turns on stock ownership and not on defendants' maintenance of separate books or filing of separate tax returns, as defendants contend. Harnafin owns 100% of all shares of MGS Lex, which in turn owns 100% of all shares of 551 Madison. Although MGS 551 was a leasehold corporation with no employees, the court finds that under the parent-subsidiary controlled group definition of COBRA, MGS 551, due to MGS Lex's 100% ownership of all its stock, was plaintiff's employer.

23. In regards to Common Control Group B, Example 1 of the Treasury Department regulations is helpful and reads as follows:

P Corporation owns stock possessing 80 percent of the total combined voting power of all classes of stock entitled to vote of § Corporation. P is the common parent of a parent-subsidiary controlled group consisting of member corporations P and S.

It is clear, from the example, that all of the remaining defendant corporations are members of Common Control Group B and that GAP SPA is the parent because it owns 80% of all shares of each corporation. Since *"employees of all corporations which are members of a controlled groups of corporations shall be treated as employed by a single employer,"* 26 U.S.C. § 414(b), and the court has determined that Partenope was Carner's employer, all the defendants within the GAP SPA group are one corporation, i.e., a single employer, pursuant to COBRA.

24. Therefore, the court finds that all of defendants are proper parties in this action and were plaintiff's "employer".

25. In regards to notification under CO-BRA, an employer has the duty of notifying the administrator of a qualifying event within 30 days of the qualifying event. 29 U.S.C. § 1166(a).[17] The administrator must then notify the qualified beneficiary of his rights within 14 days of when the administrator was notified of the qualifying event. 29 U.S.C. 1166(c).[18] The qualified beneficiary is then given 60 days to elect to continue coverage after he has been notified of his rights by the administrator.[19]

---

16. Treasury Department regulations are applicable pursuant to 29 U.S.C. § 1167(4) which reads in part; "any regulations prescribed by the Secretary pursuant to [26 U.S.C. § 414(t)] shall be consistent and coextensive with any regulations prescribed for similar purpose by the Secretary of the Treasury ... under such subsections."

17. COBRA reads in relevant part: "the employer of an employee under a plan must notify the administrator of a qualifying event described in paragraph (2)[termination of an employee] ..." 29 U.S.C. § 1166(a)(2).

18. COBRA reads in relevant part: "for the purposes of [notifying a qualified beneficiary of his rights], any notification shall be made within 14 days of the date on which the administrator is notified under [29 U.S.C. § 1166(a)(2)]." 29 U.S.C. 1166(c).

19. COBRA reads in relevant part: "the term 'election period' means the period which—ends not earlier than 60 days after the later of—in the case of any qualified beneficiary who receives notice under section 1166(4) of this title, the date of such notice." 29 U.S.C. § 1165(1)(C)(ii).

26. As noted above, the employer is the plan sponsor who in turn is the plan administrator, if a plan administrator is not designated in the plan. 29 U.S.C. § 1002(5), (16)(A)(iii) and (B)(i); *Lee v. Burkhart,* 991 F.2d 1004, 1010 (2d Cir.1993); *U.S. v. Carson,* 52 F.3d 1173, 1189 (2d Cir.1995).

27. In this case, the court finds that defendants, as plaintiff's employer, were the Plan sponsor and, therefore, the Plan administrator in accordance with COBRA. At trial, defendants counsel conceded that the Plan failed to designate a Plan administrator, and that defendants (and not Blue Cross), as the employer, were the Plan's administrator of defendants' health insurance Plan.[20] (Tr. at 226–227).

28. In defendants' Answer to the Second Amended Complaint, dated August 14, 1996, defendants assert, as affirmative defenses, that they gave Carner oral and written notice. The only writing that was alleged to have been sent to Carner was the February 20, 1993 letter from Ruggiero, the validity of which this court has previously questioned. The court need not address the issue of whether this letter is sufficient notice under COBRA since, at trial, defendants revoked their prior contention that the letter constituted written notice under COBRA. (Tr. at 213–214). When pressed on the issue by the court, defendants maintained that the letter was only being admitted to bear on the credibility of plaintiff's testimony. (Tr. at 214).

29. Moreover, since the court has determined in its Findings of Facts that defendants did not orally notify Carner of his right to continuation coverage at the discharge meeting, the court need not address the issue of whether oral notification is sufficient under COBRA.[21] The court finds that defendants, as the Plan administrators, are liable for failing to give Carner notice of his continuation rights within 14 days of his termination as is required by COBRA.[22]

30. Defendants contend that if they are found liable for failing to give plaintiff notice of COBRA continuation coverage, they should only be liable for 18 months of coverage, since terminated employees, who are COBRA beneficiaries, are only entitled to pay for group coverage for a maximum period of 18 months. Plaintiff argues, however, that defendants are liable for all of plaintiff's hospital costs, including those extending beyond the 18 month period, because defendants not only failed to notify plaintiff of his right to continuation group coverage but also failed to notify him that he had an option, under the Plan, to convert his group policy to an individual policy, upon the expiration of

---

**20.** Since defendants concede that they are the Plan administrator of the Plan the court need not address Blue Cross' argument that if they were deemed the Plan administrator, defendants did not properly or timely notify them of plaintiff's termination.

**21.** The court will note however that although plaintiff and defendants disagree on whether oral notice is permissible under COBRA, both seem to agree that there must be a good faith effort to comply with the statute in order for notice, whether oral or written, to be deemed sufficient. *see, Communications Workers of America v. NYNEX Corporation. et al.,* 898 F.2d 887, 892 n. 2 (2d Cir.1990); *Hubicki v. Amtrak National Passenger Railroad Company,* 808 F.Supp. 192, 196 (E.D.N.Y.1992). Had this court ruled on the issue and determined that oral notice is permissible under COBRA, the court would not have considered defendants' oral notice to Carner sufficient. Defendants' position is that they complied with COBRA by informing Carner of his right to continuation coverage, during his discharge meeting, only moments after he was told he was being fired. This notice alone, given under such circumstances, cannot be deemed a good faith effort to comply with the requirements and purpose of COBRA.

**22.** Defendants attempted to show at trial that plaintiff had knowledge of his COBRA rights long before his wife informed him of the conversation she had with her friend. Defendants argued that while employed with defendants, Carner had received his Blue Cross health insurance booklet which provided information on a beneficiaries' rights under COBRA and that as a manager at several of defendants stores, Carner was responsible for informing employees of their insurance benefits when they were hired or fired. It was shown that Ruggiero and Aingorn set company policy, wages, and benefits and that Carner, as a manager, was responsible for implementing these policies which he understood to be set and determined by Ruggiero and Aingorn, not necessarily COBRA. It was not proven at trial that Carner knew he was entitled to benefits mandated by COBRA. Even so, COBRA obligated defendants to have notified Carner of his rights after his termination even if it had been proven that plaintiff already knew them.

the 18 month maximum period for continuation coverage.

31. As defendants contend, 29 U.S.C. § 1162(2)(A)(i) limits continuation coverage to 18 months.[23] *Local 217 v. MHM,* 976 F.2d at 809. However, 29 U.S.C. § 1162(5) provides:

> In the case of a qualified beneficiary whose period of continuation coverage expires [18 months after the date of the qualifying event], the plan must, during the 180–day period ending on such expiration date, provide to the qualified beneficiary the option of enrollment under a conversion health plan otherwise generally available under the plan.

32. In this case, Blue Cross testified during trial that Carner, as a beneficiary of defendants' Plan, had an option to convert the group policy to an individual policy and could have converted to an individual health insurance policy had he applied for conversion within 90 days after the 18 month continuation coverage period expired. (see also, Plaintiffs Ex. 8).[24] Defendants did not at trial nor in their papers directly addressed this issue and do not contend that they ever informed plaintiff (after he was fired) of his right to convert his group policy to an individual policy. Defendants did show at trial that plaintiff received from the defendants, while he was employed by the defendants, a Plan Booklet, which outlined his conversion privileges. (Tr. at 57–60). However, under CO-BRA, defendants, as a Plan sponsor/adminis-

trator, had a duty to notify plaintiff of his right to continuation or conversion coverage both at the commencement of coverage[25] *and* when the qualifying event (termination of employment) occurred. 29 U.S.C. § 1166(a)(1), (4)(a).

33. As noted above in the Findings of Facts, subsequent to his termination, plaintiff, through his attorney, wrote defendants on a number of occasions requesting information on his COBRA benefits and on how to obtain those benefits. When defendants finally did respond, there was never any mention made of plaintiff's right to either continuation or conversion coverage. The court finds that Carner was not informed of his right to convert to an individual policy and, as a result, was not given the option to convert to an individual policy, in violation of 29 U.S.C. § 1162(5). Defendants are liable for failing to give qualifying event notification to Carner of his conversion privileges under the Plan in violation of COBRA.

34. As is also noted in the Findings of Facts, plaintiff made a bona fide request for a copy of the Plan in a letter dated April 27, 1993. (Plaintiffs Ex. 1). Defendants did not produce the Plan until June 22, 1994, approximately 421 days after the request.

35. 29 U.S.C. § 1024(b)(4) states that "the administrator shall, upon request of any participant or beneficiary, furnish a copy of the latest updated summary plan description ..." In this case, defendants eventually sup-

**23.** The statute reads in relevant part: "the coverage must extend for at least the period beginning on the date of the qualifying event and ending not earlier than the earliest of the following: (A) maximum required period ... in the case of a qualifying event [termination of employment] ..., the date which is 18 months after the date of the qualifying event." 29 U.S.C. § 1162(2)(A)(i).

**24.** In a letter from Blue Cross to Bach, plaintiff's attorney, Blue Cross writes:

> Pursuant to the telephone conversation of March 16, 1995 between you, myself and Charles Ryan, Esq. Empire's counsel in [*Carner v. MGS. et al. v. Empire Blue Cross*], the following is information you requested from Empire regarding possible conversion of CO-BRA coverage for your client, Thomas Carner. If Mr. Carner had applied to Empire for coverage within 90 days of the effective date of the termination of COBRA coverage, he would

have been able to convert to a direct payment contract.

(Plaintiffs Ex. 8). The Plan Booklet summarizing Carner's benefits explains that a direct payment contract "has benefits most comparable to the benefits of this contract under any of the following circumstances: ... you no longer qualify as a group member ... [and states that in order] to convert to a new direct payment contract, [beneficiary] must apply within ... 90 days after termination [of coverage]." (Joint Ex. 4). Carner would no longer have qualified as a group member upon the termination of COBRA continuation coverage, i.e. when the 18 month period expired.

**25.** ERISA reads in relevant part: "the administrator shall furnish to each participant, and each beneficiary receiving benefits under the play, a copy of the summary plan description ... within 90 days after he becomes a participant." 29 U.S.C. § 1024(b)(1)(A).

plied a copy of the Plan, but it was not until after the commencement of this action, pursuant to plaintiff's request for documents during discovery. The court finds that defendants violated 29 U.S.C. § 1024(b)(4) by failing to timely provide a copy of the Plan description to plaintiff, pursuant to plaintiff's written request dated April 27, 1993.[26]

36. Lastly, plaintiff maintains that defendants are not only the Plan administrator but are also the Plan fiduciary and should be held responsible for plaintiff's entire medical costs for breaching their fiduciary duty.[27] Plaintiff argues that as the fiduciary of the Plan, defendants breached their fiduciary duties by failing to provide him with election notice of continuation and conversion coverage upon the occurrence of a qualifying event, by failing to provide him with a copy of the Plan after his written request and by failing to supply him with complete and accurate information when he requested a COBRA application.

37. As has been noted, defendants initially argued that Blue Cross was the Plan administrator and was responsible for notifying Carner of his rights under ERISA and COBRA. At trial, however, defendants conceded that they, and not Blue Cross, were the Plan administrator. Defendants assert that Blue Cross should still be held liable because it was the fiduciary of the Plan and, as such, had a duty to notify plaintiff of his COBRA rights. They maintain that Blue Cross should be held completely or at least jointly liable for plaintiff's damages. Defendants cite *Sixty–Five v. Blue Cross and Blue Shield*, 583 F.Supp. 380 (S.D.N.Y.1984) to support their argument that because Blue Cross had the discretion to grant or deny claims, it was a fiduciary and could be held liable for breaching its fiduciary duties. *Id.*

at 385 ("The discretion to grant or deny claims, without more, has been held sufficient to support a finding of fiduciary status").

38. In response, Blue Cross argues that defendants, as Plan administrator, are the fiduciary of the Plan and argues that to the extent that it is deemed a fiduciary, it is only a fiduciary with respect to the processing of claims, not of notifying beneficiaries of their rights under the Plan. This court agrees.

39. In *Sixty–Five*, the court noted that the Second Circuit had not yet considered the application of the ERISA fiduciary provisions to an insurer and decided that because Blue Cross was not acting as a "mere insurer" in that case but was also managing the disposition of money plaintiff had paid to it, Blue Cross was a fiduciary. The court went on to describe a situation in which Blue Cross was acting as a "mere insurer." *Id.* at 385. (Mere insurer status when Blue Cross makes payments out of its own funds, rather than plaintiff's, in consideration for premiums paid to it by plan sponsor or beneficiaries). In this case, the court finds, that unlike in *Sixty–Five*, Blue Cross is a "mere insurer." At trial, defendants agreed that Blue Cross was the service provider. (Tr. at 231).

40. Moreover, the Second Circuit has recently decided that in accordance with Department of Labor Regulations which specifically address the issue of fiduciary responsibilities under ERISA, a person performing "ministerial functions" is not a fiduciary. *Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18, 21 (2d Cir.1996); *see also*, 29 C.F.R. § 2509.75–8. The court determined that according to the regulations, "ministerial functions" include "the determination of eligibility for participation

---

**26.** Plaintiff requests the court to fine defendants $100.00 per day for each day defendants failed to supply a copy of the Plan. Such sanctioning is clearly within this court's discretion pursuant to 29 U.S.C. § 1132(c). It was agreed by the parties during trial (Tr. at 98) that there would be a separate hearing on damages when the court will consider this issue during those proceedings.

**27.** ERISA fiduciary is defined in relevant part as "a person … to the extent (I) he exercises any

discretionary authority or discretionary control respecting management of [an ERISA] plan … or (iii) *he has any discretionary authority or discretionary responsibility in the administration of such plan.*" 29 U.S.C. § 1002(21)(A) (emphasis added). A plan participant or beneficiary can bring civil actions against plan fiduciary for any damages resulting from failure to disclose information about plan or benefits. 29 U.S.C. 1001(b), 1132(a)(1)(B); *see also, Howard v. Gleason Corporation, et al.*, 901 F.2d 1154; 1159 (2d Cir.1990).

or benefits, the maintenance of service and employment records, the calculation of benefits, and the *processing of claims*. A person performing these functions is not a fiduciary." *Geller*, 86 F.3d at 21 (emphasis added).

41. The Second Circuit has also determined that "ERISA permits employers to wear 'two hats,' and that they assume fiduciary status 'only when and to what extent' they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Amato v. Western Union International, Inc.*, 773 F.2d 1402, 1416 (2d Cir.1985); *see also*, 29 C.F.R. § 2509.75–8 ("some offices or positions of an employee benefit plan by their very nature require persons who hold them to perform one or more of the functions described in section 3(21)(A) of [ERISA]. For example, a plan administrator . . . of a plan, must, be (sic) the very nature of his position, have "discretionary authority or discretionary responsibility in the administration" of the plan . . . persons who hold such positions will therefore be fiduciaries").

42. In this case, in accordance with the cases cited above, the court finds that defendants, as Plan administrator, were responsible for distributing the Summary Plan Booklet to Plan participants (a duty defendants admitted that they fulfilled) and for giving plaintiff notice of his rights under COBRA were also the fiduciaries of the Plan and that Blue Cross was not a fiduciary of the Plan with respect to giving election notice because it processed claims of beneficiaries of defendants' Plan.[28]

43. An ERISA fiduciary breaches his duty to a plan participant "by preventing or interfering with the receipt of benefits to which the participant is entitled." *Blatt*, 812 F.2d at 812.

44. The court thereby finds, in accordance with the above Findings of Facts and Conclusions of Law, that defendants breached their fiduciary duties "by preventing or interfering" with Carner's receipt of benefits to which he was entitled to under COBRA. Specifically, defendants breached their fiduciary duties by failing to notify plaintiff in violation of 29 U.S.C. § 1161 et seq. and by failing to provide a copy of the Plan in a timely manner in violation of 29 U.S.C. § 1104(a).

**SO ORDERED**

---

28. In an opinion that preceded *Geller*, the Second Circuit determined that Blue Cross could possibly be held to be a fiduciary because it processed claims. *F.H. Krear & Co., v. Nineteen Named Trustees, et al.*, 810 F.2d 1250 (2d Cir. 1987). The court held, however, that a person "may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he has or exercises the described authority or responsibility," *Id.* at 1258, and concluded that Blue Cross may have been a fiduciary with respect to the processing of claims, i.e., the area over which it had discretionary authority, but that it was not a fiduciary with respect to compensation. *see also, Blatt v. Marshall and Lassman*, 812 F.2d 810, 812 (2d Cir. 1987) ("an entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary . . . rather, fiduciary status exists with respect to any activity enumerated in the statute over which the entity exercises discretion or control"). Therefore, in this case, even if the court were to hold that Blue Cross was a fiduciary because it processed claims, Blue Cross would only be a fiduciary with respect to the processing of claims since that is the area in which it exercised discretionary authority, not qualifying event notification which is the subject of this action.